## IN RE GEORGE H. CORLISS.

The office of a commissioner of the United States Centennial Commission is an "office of trust," under art. 2, § 1 of the Constitution of the United States.

Such a commissioner, when chosen an elector of the President and Vice-president of the United States, cannot, by declining the office of elector, create such a vacancy therein as is provided for by Gen. Stat. R. I. cap. 11, § 7.

A person disqualified as elector of the President and Vice-president of the United States, by holding an "office of trust or profit under the United States," cannot remove the disqualification by resigning the office, unless his resignation precedes his appointment as elector, or, in Rhode Island, his election to the position of elector.

The election to such position of a person so disqualified does not result in the election of the candidate receiving the next highest number of votes, but in a failure to elect.

The case of such failure is provided for by Gen. Stat. R. I. cap. 11.

GEORGE H. CORLISS, chosen in Rhode Island an elector of the President and Vice-president of the United States, in November, A. D. 1876, was, when chosen, the Commissioner from Rhode Island of the United States Centennial Commission. Thereupon the governor, acting under article 10, section 3, of the Constitution of the state, which provides that "the judges of the Supreme Court shall give their written opinion upon any question of law whenever requested by the governor," addressed to them the following communication : —

"*To the Honorable the Judges of the Supreme Court of the State of Rhode Island :*

"The undersigned, Henry Lippitt, governor of said state, respectfully asks for a written opinion upon the following questions of law : —

"First. Is the office of Commissioner of the United States Centennial Commission such an office of trust or profit under the United States as to disqualify its holder for the office of elector of President and Vice-president of the United States ?

"Second. If so, does such a candidate for the office of elector who receives a plurality of the legal votes given, and declines said office, create such a vacancy as is provided for in section 7, chapter 11, of the General Statutes ?

"Third. If no, is the disqualification removed by the resignation of said office of 'trust or profit ?'

"Fourth. If not, does the disqualification result in the election of a candidate next in vote, or in a failure to elect ?

"Fifth. If, by reason of the disqualification of the candidate who received a plurality of the votes given there was no election, can the general assembly in grand committee elect an elector ?

"Please favor me with a reply at the earliest possible moment.
"HENRY LIPPITT, *Governor.*"

### OPINION OF THE COURT.

*November 28, 1876.*

*To His Excellency, Henry Lippitt, Governor of the State of Rhode Island and Providence Plantations :*

We have received from your Excellency a communication requesting our opinion upon the following questions, to wit : —

" First. Is the office of Commissioner of the United States Centennial Commission such an office of trust or profit under the United States as to disqualify its holder for the office of elector of President and Vice-president of the United States ?

"Second. If so, does such a candidate for the office of elector who receives a plurality of the legal votes given, and declines said office, create thereby such a vacancy as is provided for in section 7, chapter 11, of the General Statutes ?

" Third. If no, is the disqualification removed by the resignation of said office of trust or profit ?

" Fourth. If not, does the disqulaification result in the election of the candidate next in vote, or in a failure to elect ?

" Fifth. If, by reason of the disqualification of the candidate who received a plurality of the votes given there was no election, can the general assembly in grand committee elect an elector ? "

We will give our opinion upon the foregoing questions in the order in which they are propounded.

1. We think a Commissioner of the United States Centennial Commission holds an office of trust under the United States, and that he is therefore disqualified for the office of elector of President and Vice-president of the United States.

The commission was created under a statute of the United States, approved March 3, 1871. That statute provides for the holding of an exhibition of American and foreign arts, products, and manufactures, " under the auspices of the government of the United States," and for the constitution of a commission, to consist of not more than one delegate from each state and from each territory of the United States, " whose functions shall continue until the close of the exhibition," and " whose duty it shall be to prepare and superintend the execution of a plan for holding the exhibition." Under the statute the commissioners are appointed by the President of the United States, on the nomination of the governors of the states and territories respectively. Various duties were imposed upon the commission, and under the statute provision was to be made for it to have exclusive control of the exhibition before the President should announce, by proclamation, the time and place of opening and holding the exhibition. By an act of Congress approved June 1st, 1872, the duties and functions of the commission were further increased and de-

fined.   That act creates a corporation, called " The Centennial
Board of Finance," to coöperate with the commission and to raise
and disburse the funds.   It was to be organized under the direc-
tion of the commission.   The seventh section of the act provides
" that the grounds for the exhibition shall be prepared and the
buildings erected by the said corporation, in accordance with
plans which shall have been previously adopted by the United
States Centennial Commission; and the rules and regulations of
said corporation, governing rates for entrance and admission fees,
or otherwise affecting the rights, privileges, or interests of the
exhibitors, or of the public, shall be fixed and established by the
United States Centennial Commission; and no grant conferring
rights or privileges of any description connected with said grounds
or buildings, or relating to said exhibition or celebration, shall be
made without the consent of the United States Centennial Com-
mission, and said commission shall have power to control, change,
or revoke all such grants, and shall appoint all judges and ex-
aminers, and award all premiums."   The tenth section of the
act provides that " it shall be the duty of the United States Cen-
tennial Commission to supervise the closing up of the affairs of
said corporation, to audit its accounts, and submit in a report to
the President of the United States the financial results of the
centennial exhibition."

Is is apparent from this statement, which is but partial, that
the duties and functions of the commission were various, delicate,
and important; that they could be successfully performed only
by men of large experience and knowledge of affairs; and that
they were not merely subordinate and provisional, but in the
highest degree authoritative, discretionary, and final in their
character.   We think that persons performing such duties and
exercising such functions, in pursuance of statutory direction and
authority, are not to be regarded as mere employees, agents, or
committee men, but that they are, properly speaking, officers,
and that the places which they hold are offices.   It appears,
moreover, that they were originally regarded as officers by Con-
gress; for the act under which they were appointed declares,
sec. 7, that " no compensation for services shall be paid to the
commissioners or *other officers*, provided by this act, from the
treasury of the United States."   The only other officers pro-

vided for were the "alternates" appointed to serve as commissioners when the commissioners were unable to attend.

We think, too, the office is an office "under the United States." It was created by act of Congress, and all its powers and duties were conferred and imposed by Congress. It was created not for the service of any particular state or section, but in the interest of all the States united. The commissioners were appointed under the act by the President, and were commissioned like other United States officers. There seems to be no room for doubt upon this point.

Is it an "office of *trust or profit* under the United States?" It is not an office of profit under the United States, for the commissioners are not entitled to any pay from the United States, nor to any perquisite or emolument under any law of the United States. But we think it is an office of trust. It is true that originally the United States had no pecuniary interest in the exhibition. The commissioners, however, were to be intrusted with a large supervisory and regulative control of the property sent for exhibition; and from the time the government gave its sanction to the exhibition, and especially after the President issued his proclamation, the honor and reputation of the United States were pledged for its proper management to its own citizens and to foreign nations. From that time the honor and reputation of the United States were largely in the keeping of the commissioners; and in this view there was a very delicate and important trust reposed in them. It would be a narrow, and we think an improper interpretation, to hold that an office is an office of trust only when the officer has the handling of public money or property, or the care and oversight of some pecuniary interest of the government. But, even if it were so, there came a time when the United States did become pecuniarily interested in the exhibition by the appropriation of a million and a half of dollars for it, to be repaid out of the profits if any should accrue; and when, also, valuable property belonging to the United States was exhibited on the exhibition grounds. We repeat that the office is, in our opinion, an office of trust.

There is another point deserving mention before we pass to the next question. By the act approved June 1, 1872, the commission was incorporated under the name of "The United States

Centennial Commission." Did this in any manner terminate or alter its official character? We think not. The change was merely formal, and made, we suppose, to facilitate the transaction of business. Indeed, in the papers annexed to the report of the commission to Congress, it appears that the commission had assumed the name of the United States Centennial Commission before its incorporation, and that the act of June 1, 1872, was passed on its recommendation. We do not see, therefore, why the commissioners were not as much United States officers after as before their incorporation.

2. We think a centennial commissioner, who was a candidate for the office of elector, and received a plurality of the votes, does not, by declining the office, create such a vacancy as is provided for by Gen. Stat. R. I. cap. 11, § 7. Section 7 is as follows : —

"If any electors, chosen as aforesaid, shall, after their said election, decline the said office, or be prevented by any cause from serving therein, the other electors, when met in Bristol in pursuance of this chapter, shall fill such vacancies, and shall file a certificate in the secretary's office of the person or persons by them appointed."

Before any person can decline under this section, he must first be elected, and no person can be elected who is ineligible, or, in other words, incapable of being elected. " Resignation," said Lord Cockburn, C. J., in *The Queen* v. *Blizard*, L. R. 2 Q. B. 55, "implies that the person resigning has been elected into the office he resigns. A man cannot resign that which he is not entitled to, and which he has no right to occupy."

3. We think the disqualification is not removed by the resignation of the office of trust, unless the office is resigned before the election. The language of the Constitution is, that no person " holding an office of trust or profit under the United States shall be *appointed* an elector." Under our law, Gen. Stat. R. I. cap. 11, §§ 1, 2, the election by the people constitutes the appointment. The duty of the governor is to " examine and count the votes, and give notice to the electors of their election." He merely ascertains — he does not complete — the appointment. A resignation, therefore, after the election is too late to be effectual.

4. We think the disqualification does not result in the election of the candidate next in vote, but in a failure to elect.

In England it has been held that where electors vote for an ineligible candidate knowing his disqualification, their votes are not to be counted any more than if they were thrown for a dead man, or the man in the moon; and that in such a case the opposing candidate, being qualified, will be elected, though he has but a minority of the votes. *King* v. *Hawkins,* 10 East, 211, affirmed in 2 Dow, 124; *Reg.* v. *Coaks,* 3 El. & B. 249. But even in England, if the disqualification is unknown, the minority candidate is not entitled to the office, the election being a failure. *Queen* v. *Hiorns,* 7 Ad. & E. 960; *Rex* v. *Bridge,* 1 M. & S. 76. And it has been held, that to entitle the minority candidate to the office it is not enough that the electors know of the facts which amount to a disqualification, unless they likewise know that they amount to it in point of law. *The Queen* v. *The Mayor, &c. of Tewkesbury,* L. R. 3 Q. B. 629. In this country the law is certainly not more favorable to the minority candidate. *State* v. *Giles,* 1 Chand. Wis. 112; *State* v. *Smith,* 14 Wis. 497; *Saunders* v. *Haynes,* 13 Cal. 145; *People* v. *Clute,* 50 N. Y. 451; *Commonwealth* v. *Cluley,* 56 Pa. St. 270. The question submitted to us does not allege or imply that the electors, knowing the disqualification, voted for the ineligible candidate in wilful defiance of the law; and certainly, in the absence of proof, it is not to be presumed that they so voted. The only effect of the disqualification, in our opinion, is to render void the election of the candidate who is disqualified, and to leave one place in the electoral college unfilled.

5. Our statute, Gen. Stat. R. I. cap. 11, § 5, provides that " if by reason of the votes being equally divided, *or otherwise,* there shall not be an election of the number of electors to which the state may be entitled, the governor shall forthwith convene the general assembly at Providence, for the choice of electors to fill such vacancy, by an election in grand committee." We think this provision covers the contingency which has happened, and that, therefore, the general assembly in grand committee can elect an elector to fill up the number to which the state is entitled. The law of the United States provides that " whenever any state has held an election for the purpose of choosing electors, and has failed to make choice on the day prescribed by law, the electors may be appointed on a subsequent day in such

manner as the legislature of such state may direct." U. S. Gen. Stat. p. 21, sec. 134.

THOMAS DURFEE,
W. S. BURGES,
E. R. POTTER,
CHARLES MATTESON.

OPINION OF STINESS, J.

PROVIDENCE, R. I. *November* 28, 1876.

SIR, — Upon the first question submitted by you, namely, ' Is the office of Commissioner of the United States Centennial Commission an office of trust or profit under the United States, within the meaning of the Constitution, so as to render a person ineligible as an elector ? " &c., I find myself compelled to dissent from the majority of the justices of the Supreme Court.

While the fact that the learned justices composing the majority hold an opinion different from mine might well lead me to doubt the correctness of my own conclusion, it nevertheless renders it proper that I should give some of the reasons that lead me to that conclusion.

By act of Congress approved March 3, 1871, the commission was constituted. The preamble recites that it is desirable that there should be an exhibition of the resources, arts, &c., of the country, in comparison with those of older nations, at Philadelphia, which " should have the sanction of the Congress of the United States ; " and the first section provides that such an exhibition shall be held under the " auspices of the government."

The act further provides that commissioners, one from each state, &c., shall be appointed, by the President, on the nomination of the governors of the respective states, " to prepare and superintend the execution of a plan for holding the exhibition," and to report such plan, with its incidents to Congress.

Did the commissioners appointed under this act hold " an office of trust under the United States " within the meaning of that term as used in the Constitution ?

I think not. True they are appointed by the President and hold his commission ; hence, if they are officers it must be under the United States, rather than under their respective states, even

though they are nominated by the governors. Nevertheless, this mode of appointment would go far to remove them from the operation of the spirit of the Constitution, and from that class of executive favorites against which it was the evident intention to guard. Still the mere fact that they hold such a commission cannot bring them within a class precluded by the Constitution. It is difficult, if not impossible, to conceive a case where a person, so commissioned, would not be, in some sense, an officer; and every office implies in some degree trust and confidence. Hence it might be claimed that every such appointment imports an office of trust. But this cannot be the meaning of the Constitution, for the language is, "holding an office of trust or profit under the United States." The words "trust or profit" are words of limitation, and restrict the operation of the remainder of the phrase. If every officer was to be interdicted, the prohibition would have applied to persons holding *any* office under the United States. The words of limitation, therefore, clearly point to considerations other than the holding of an office.

While with reference to the question you have submitted, it might be conceded that the commissioners were officers, to my mind they would, in view of the duties imposed upon them by the act referred to, more nearly resemble a committee chosen outside the appointing body, to whom was referred a subject which they were to examine and report upon. I can hardly think that Congress intended by that act to create a new body of public officers, or supposed that it had done so. For example : the Constitution provides that no person holding any office under the United States shall be a member of either house during his continuance in office. Yet it is a notable fact that the President of this very commission was for a long time a representative in Congress.

But if it is admitted that they are officers, it does not necessarily follow that they hold an " office of trust or profit." They were to receive no salary, and nowhere in the act does anything appear which indicates a " trust " beyond that implied in every appointment, except in the words, " superintend the execution of a plan for holding the exhibition," in the provision, that " the functions " of the commission " shall continue until the close of the exhibition ; " and in sec. 8, " That whenever the President

shall be informed by the Governor of the State of Pennsylvania that provision has been made for the erection of suitable buildings for the purpose, and for the exclusive control, by the commission herein provided for, of the proposed exhibition," the President shall make proclamation, &c., and send copies to foreign nations.

But even in these words, what "trust" do the commissioners receive? What power is conferred upon them? What discretion are they to exercise on behalf of the United States? They can make no contracts; they are not authorized to carry out any plan they may devise, nor can they in any way cause or compel it to be carried out. What then are they to superintend? Of course, they may do what they please as individuals, and on their personal responsibility, but nothing as "officers" except what is specified in the act; and all that the act provides for, so far as the government is concerned, is a report to Congress. That having been made, their duties cease as to all matters over which Congress then had control.

The provisions for the exhibition and the erection of suitable buildings were not to be made by the United States. Indeed, the chance for any liability on the part of the government is carefully excluded by this act. If the commissioners were trustees at all, they were the trustees of such private parties as might undertake the work, and they were to act only under the "sanction" and "auspices" of the United States. The purpose of the act seems to have been simply to assure exhibitors at home and abroad that the managers of the exhibition would be selected in such a manner as to secure men worthy of their confidence, and that their rare and costly articles would not be in the hands of irresponsible adventurers, but of those who, acting under the "sanction of the United States," might be understood to be men of intelligence, integrity, and responsibility.

There appears to me to be nothing in this denoting a "trust" within the meaning of the Constitution.

June 1, 1872, another act was approved which created two corporations: one by sec. 1, styled "The Centennial Board of Finance," naming the corporators; and the other by sec. 11, as follows: —

"That the commission created by the act referred to in the

preamble of this act is hereby made and constituted a body politic and corporate in law, with power to do such acts and to enter into such obligations as may be promotive of the purposes for which such commission was established. Its title shall be The United States Centennial Commission. It shall have a common and a corporate seal, and possess all the rights incident to corporate existence."

The board of finance was to provide the means necessary to carry the plans of the United States Centennial Commission into effect, erect suitable buildings, &c., subject, however, to such rules and regulations as said commission should see fit to make. The commmission was to audit their accounts, &c., report to Congress, and was clothed with full power to carry forward the exhibition. In the duties allotted to the commission in this act, we see something more nearly resembling a trust ; not, indeed, anything belonging to the government, for the act provides that " nothing in this act shall be so construed as to create any liability of the United States, direct or indirect, for any debt or obligation incurred, nor for any claim by the Centennial International Exhibition, or the corporation hereby created, for aid or pecuniary assistance, from Congress or the treasury of the United States, in support or liquidation of any debts or obligations created by the corporation herein authorized."

But suppose we assume, in view of the subsequent appropriation made by Congress, that a trust is barely conferred, it will be observed that duties are imposed not upon the commissioners as such, but upon the United States Centennial Commission, the *corporation* for this purpose and by this act created, which in the act is uniformly referred to by its corporate name. If anything remained for the commissioners to do under the act of March 3, 1871, it was by the act of June 1, 1872, transferred to the corporation in the same way that the general assembly,' if it should pass an act to create a commission to audit all accounts of the state, and to do all things theretofore done by the state auditors, would thereby take from him all his powers and duties and transfer them to the new commission.

It may be said that this corporation was merely for the convenience of the commissioners in the transaction of their duties, and that they remained officers as much as before. But when I

find that before this act nothing remained for the commissioners to do as officers on behalf of the government, and that in this act every reference is to the corporation, upon which new duties are imposed, different from those originally stated, I cannot think that such was the purpose. Under the first act nothing was required of the commissioners which involved pecuniary liability. Under the second there might be, and therefore the intention was to take from them the personal relations they had hitherto held to this enterprise and merge them in a corporate body.

By the act of June 1, 1872, each commissioner became a member of the corporation. As commissioner he was *functus officio*, and the only operative effect of the commission was to designate him, or a new member in case of a vacancy, as a corporator of the new body corporate. The corporation, therefore, was the trustee, and not the members as individuals.

The question, then, resolves itself into this: Is a member of a corporation which acts as the agent of the government in a matter of trust or profit to be regarded as " holding an office of trust or profit under the United States ? " Clearly not. To hold such a doctrine would extend the operation of this clause of the Constitution far beyond the original intention, and the limits of the mischief it was designed to forestall.

I conclude, therefore, that under the original act no " office of trust under the United States " was created ; that by the second act, in which duties are confided to the commission in the nature of a trust, the corporation is the trustee, and not the members as such ; that at the date of the election of electors a member of that commission did not hold such an office as rendered him ineligible as an elector.

As to the replies to the remaining questions, I concur with the other justices.

   I have the honor to be,

    Very respectfully, your obedient servant,

          JOHN H. STINESS.

NOTE BY MR. JUSTICE STINESS. — In the early and thoroughly considered case, *Commonwealth* v. *Binns*, 17 S. & R. 219, the court hold that the selection by the secretary of the United States of an editor of a newspaper to print the laws of the United States

is not conferring an office under the United States, incompatible, under an act of the assembly, with the office of alderman of the city of Philadelphia.

*Sheboygan Co.* v. *Parker*, 3 Wall. 93. Commissioners to issue county bonds in aid of a railroad — *Held*, not to be county officers; the court remarking: "They do not exercise any of the political functions of officers; . . . . they do not exercise continuously, and as a part of the regular and permanent administration of the government, any important public powers, trusts, or duties."

*Lindsey* v. *Atty. Gen.* 33 Miss. 508. A pension agent of the United States not an officer of the federal government. " He is not required to take an oath of office, or to perform any other services than such as may be confided to him by the war department, of which he is merely for this special business an agent."

*Saunders* v. *Haynes*, 13 Cal. 145. Whether an inspector of customs appointed by the collector at a price *per diem* is an officer of the United States, *query ?*

NOTE. — For a commentary on these opinions see Amer. Law Register N. S. vol. 16, p. 21, January, 1877.