James L. PERRY and Carolyn S. Perry, Appellants–Plaintiffs,

v.

GULF STREAM COACH, INC., Appellee–Defendant.

No. 49A05–0612–CV–753.

Court of Appeals of Indiana.

Aug. 17, 2007.

---

Robert S. Rifkin, Clinton E. Blanck, Maurer Rifkin & Hill, P.C., Carmel, IN, Attorneys for Appellants.

Robert L. Hartley, Robert B. Thornburg, Maggie L. Smith, Locke Reynolds LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

James L. Perry[1] and Carolyn S. Perry (collectively, the "Perrys") appeal from the trial court's order granting Gulf Stream Coach, Inc.'s ("Gulf Stream") motion in limine. The Perrys raise a single issue for our review, namely, whether the court abused its discretion in prohibiting the Perrys from pursuing claims and remedies available under the Magnuson–Moss Warranty Act, 15 U.S.C. §§ 2301–2312 ("Magnuson–Moss").

We affirm.

### FACTS AND PROCEDURAL HISTORY

In *Perry v. Gulf Stream Coach, Inc.*, 814 N.E.2d 634, 637–42 (Ind.Ct.App.2004), trans. denied ("*Perry I*"), we described the relevant facts as follows:

#### I. Background

The relevant designated facts are undisputed. In 1999, the Perrys decided to purchase "a Class A motor home with a length of 25 or 26 feet." Because Gulf Stream is in the business of manufacturing and selling motor homes, the Perrys contacted Gulf Stream and inquired into purchasing a Class A motor home. Gulf Stream gave the Perrys the contact information for Mark's RV, an authorized dealer for Gulf Stream. On December 8, 1999, the Perrys arrived at Mark's RV and read a brochure ("Brochure") regarding the "Conquest 2000 by Gulf Stream." The Brochure indicated that the Conquest 2000 had power steering and brakes and a Front Gross Axle Weight Rating ("Front GAWR") of 4,800 pounds.[2] In addition, the Brochure highlighted numerous features of the Conquest 2000, including "Generous Overhead Storage," "Large Under Bed Storage," and "Steel–Formed Exterior Storage." The Brochure directed those who wish to purchase the Conquest 2000 to "√ MARK'S [RV] BEFORE YOU BUY." The Brochure also provided potential customers with Mark's RV's business address, phone number, and Internet address.

#### II. Purchase Agreement and Limited Warranty

At Mark's RV, the Perrys walked through the Conquest 2000 ("Motor Home") for five to ten minutes "to see if it matched the [B]rochure." The Perrys did not test drive the Motor Home. That

---

1. James Perry died on February 3, 2005, although there appears to have been no change in the parties as a result.

2. The Motor Home had a manufacturer's label, which represented that the Front GAWR was 4300. However, this label was determined to be incorrect.

same day, the Perrys agreed to purchase the Motor Home for a price of $54,521.50. The Purchase Agreement between Mark's RV and the Perrys provides, in part, that:

Purchasers certify that the matter printed on the back hereof has been read and agreed to as a part of this agreement the same as though it were printed above the signatures....

On the back of the Purchase Agreement, the following clause appears:

7. Warranties: The dealer shall give over to the buyer copies of any and all written warranties covering the within described unit, or any appliance or component therein, which have been provided by the manufacturer of the unit or compliance or component, respectively. IT IS UNDERSTOOD AND AGREED THAT EXCEPT AS MAY BE REQUIRED UNDER APPLICABLE STATE LAW THE DEALER MAKES NO WARRANTIES WHATSOEVER REGARDING THE UNIT OR ANY APPLIANCE OR COMPONENT CONTAINED THEREIN. THE DEALER EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES [WARRANTIES], INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR USE.

The purchaser further represents he has examined the product and found it suitable for his particular needs, that it is of acceptable quality, and that he did rely on his own judgment and inspection and not on any warranty, express or implied.

On the bottom of the back page, the following integration clause appears:

This agreement contains the entire understanding between buyer and seller and no other representation or inducement, verbal or written, has been made which is not set forth herein.

Along with the Purchase Agreement, Mr. Perry also signed the "Gulf Stream Coach, Inc. Limited Warranty" ("Limited Warranty"), which provides, in relevant part, that:

1. *WHAT IS COVERED*

Your new recreational vehicle has a limited warranty by [Gulf Stream] to the original purchaser as follows:

a) A two (2) year or 24,000 miles of use warranty (whichever comes first) against structural defects in floors, walls and roof.

b) A full one (1) year or 12,000 miles of use warranty (whichever comes first) under normal use against defects in materials and/or workmanship in the construction of the vehicle and its original components.

... All obligations of Gulf Stream pursuant to this Limited Warranty are limited to replacing or repairing the defective part or component.

This limited warranty is expressly IN LIEU of any other express warranty and is further IN LIEU of any implied warranty, including, but not limited to, any implied WARRANTY OF MERCHANTABILITY or FITNESS for a particular purpose except as may otherwise be required by applicable valid Federal or State law at time of manufacture.

### III. Weight–Bearing Capacity of the Motor Home

The Motor Home has the following manufacturer's rated capacities: (1) a fifty gallon fresh water tank at 8.328 pounds per gallon for a total weight of 416.4 pounds;

(2) a fifty gallon water gray holding tank for a total weight of 416.4 pounds; (2) a fifty gallon water black holding tank for a total weight of 416.4 pounds; (3) an LP gas tank with a capacity of sixty-five pounds; (4) a forty gallon fuel tank at six pounds per gallon for a total weight of 240 pounds; (5) four passengers at one hundred and fifty pounds per person when the passengers are seated, belted, and traveling for a total weight of 600 pounds.

Despite these weighted capacities, the Certificate of Origin of the chassis of the Motor Home, which was built by Workhorse Custom Chassis, LLC, ("Workhorse") demonstrates that the shipping weight of the chassis was 4,221 pounds and that the Gross Vehicle Weight Rating ("GVWR") is 12,300 pounds. The Certificate of Origin of the Motor Home, i.e., chassis and motor home body, indicates that the shipping weight of the vehicle was 11,073 pounds and that the GVWR is 12,300 pounds. The latter shipping weight, however, did not include the weight of any fluids. The difference between the GVWR—i.e., the maximum weight capacity of the Motor Home—and the shipping weight of the Motor Home after it was fully assembled by Gulf Stream is 1,227 pounds.

*IV. Owner's Manual of the Motor Home*

The owner's manual to the Motor Home provides, in relevant part, as follows:

*VEHICLE LOADING*

*Carrying Capacity*

During the design and development of our motor homes, the number and size of storage compartments are maximized for value and convenience. If the motor home operator fills all liquid tanks to capacity, fills all storage compartments and cupboards to maximum volume and fills all available seating positions with passengers, the motor home will probably be overloaded. According to National Highway Traffic Safety Administration figures, an average vehicle occupant weighs 150 pounds, each gallon of gasoline weighs six pounds and each gallon of water weighs over eight pounds. The operator is responsible for analyzing the conditions in which the motor home will be utilized for each trip.

The number of passengers and placement of cargo will affect the amount of water and cargo that you can carry. The passenger capacity will vary depending on whether the vehicle is being used for overnight camping or day use. A smaller passenger capacity for camping will provide reasonable cargo capacity for trips taking more than one day. The passenger capacity for day use can be larger providing that less cargo is carried for trips and activities not involving overnight stays. It may be necessary to reduce the amount of water carried and unload some cargo items normally carried for camping in order to provide carrying capacity for the additional 1(one) day use passengers.

Thoughtful consideration of the weight placed in the motor home can yield important benefits:

- maximum flexibility in the use of the liberal storage facilities provided in the motor home;
- improved handling characteristics and ride comfort;
- better fuel mileage and reduced tire wear.

Periodically reweigh your motor home. Different traveling configurations may change your loading and weight pattern.

WARNING: DO NOT EXCEED THE RATED LOAD OF THE MOTOR HOME, OR THE RATED LOAD OF ANY AXLE.

NOTE: THE CARRYING CAPACITY OF YOUR MOTOR HOME CAN BE DETERMINED BY WEIGHING, AS SHOWN IN FIG. 2. THE SHIPPING WEIGHT DOES NOT INCLUDE OPTIONS SUCH AS LEVELING JACKS, AWNINGS, ROOF PODS, ETC. THE WEIGHT OF THESE ITEMS MUST BE SUBTRACTED FROM THE TOTAL OF THE PASSENGER AND CARGO CARRYING CAPACITIES. IF YOU TOW A TRAILER . . .

Notice: Empty all holding tanks before filling fresh water tank otherwise you will limit cargo and/or passenger capacity.

\* \* \*

WARNING: EXCEEDING THE GAWR OR GVWR[3] OF YOUR MOTOR HOME CAN CAUSE UNDESIRABLE HANDLING CHARACTERISTICS AND MAY CREATE A SAFETY HAZARD.

*V. The Perrys' Use of the Motor Home*

After purchasing the Motor Home and driving it for approximately 2,000 miles, Mr. Perry noticed problems with steering. In January of 2000, the Perrys took their first trip in the Motor Home and experienced "problems with stopping, braking and handling the vehicle." In particular, the Motor Home would drift and crawl from one side of a highway lane to another; the brake pedal required a lot of pressure to stop, as if the vehicle did not have power brakes;[4] the front tire was showing unusual wear, as if the front-end were out of alignment; and it was very difficult to turn the wheel when the vehicle was stopped.

During this trip, the Perrys traveled with a full tank of fresh water and propane, but they emptied the gray and black tanks, which were used as wastewater holding tanks. The Perrys also traveled with enough clothing for the two-week trip, no camping equipment, and enough food and drink supplies to last for "at least a week or at least three or four days." In addition, the Motor Home contained three passengers, weighing a combined total of approximately 550 pounds, and a full tank of gasoline.

When the Perrys returned home after this first trip, they contacted Workhorse, Gulf Stream, and Mark's RV and informed the companies that the Motor Home was out of alignment. Workhorse authorized the Perrys to have the front-end of the Motor Home aligned. In addition, after driving the Motor Home only 6,000 or 7,000 miles, Mr. Perry replaced a front tire on the Motor Home.

Subsequently, in February of 2000, Mr. Perry, along with at least two other people, traveled to Florida and experienced the same steering and braking problems. The Perrys reported the problems to Workhorse and Gulf Stream and, in response, Workhorse arranged for the Motor Home to be inspected at Boulder–Chevrolet–Buick ("Boulder"). Boulder had the Motor Home from March 8 to March 24, 2000, during which time, it "replaced the power steering pump, steering gear and hydroboost pressure, belt, suspension and steering parts, and [adjusted the] alignment."

In his deposition, J.R. Jenson ("Jenson"), who was the Service Manager of Boulder, testified that "[he] test-drove the

---

**3.** As will be discussed later, "GVWR" is the abbreviation for Gross Vehicle Weight Rating.

**4.** Upon receiving the Motor Home, Mark's RV indicated that the vehicle's "[b]rakes seem soft."

vehicle [himself.] The steering problem reported by Mr. Perry still existed after all of the repair attempts [Boulder] made." Jenson further testified that:

14. [a]fter we followed all of the instructions given to us by Workhorse and by Chevrolet, the steering problem with the motor home persisted.

15. Representatives from Workhouse [sic] stated that the problem may be due to excess weight on the front axle from the motor home body and suggested that the vehicle be weighed. . . .

## VI. The Weight of the Motor Home

At the request of Workhorse, the Perrys had the Motor Home weighed on four separate occasions. On March 24, 2000, with Mr. Perry, i.e., weighing 180 pounds, in the driver's seat, less than one-half tank of gasoline, no water, some propane fuel, and some camping gear, the weight over the front axle was 4,940 pounds and the gross vehicle weight was 11,680 pounds. On March 28, 2000, with Mr. Perry in the driver's seat, less than one-half tank of gasoline, no water, some propane fuel, and no camping gear, the weight over the front axle was 4,800 pounds and the gross vehicle weight was 11,140 pounds. On May 11, 2000, with no driver or passengers, less than one-half tank of gasoline, no water, some propane fuel, and no gear, the weight over the front axle was 4,620 pounds and the gross vehicle weight was 10,940 pounds. Lastly, on August 22, 2001, with no passengers, a full tank of gasoline, no water, some propane fuel, and no gear, the weight over the front axle was 4,640 pounds and the gross vehicle weight was 11,030 pounds.

On May 15, 2000, Workhorse Representative Winston M. Moore ("Moore") examined the Motor Home and determined that its brakes and steering were normal. Anthony Suddon ("Suddon"), Director of Consumer Affairs with Gulf Stream, also inspected the Motor Home and determined that "[t]he vehicle drove with no problems at all times during the inspection. The weights show that the vehicle has sufficient cargo capacity if loaded properly. It is my belief that the Perry's [sic] feel the steering and brake condition is caused by the vehicle being overweight. The vehicle is not overweight and the steering and braking work as designed." Because he believed that no repairs were necessary, Suddon did not recommend any repairs for the Motor Home. Rather, he noted that "[i]f the Perry's [sic] wish to have more carrying capacity for the front rear axle I would suggest upgrading the tires." With the tires installed by the chassis manufacture, "[t]he maximum weight allowed on the front axle is 4,880 lbs."

## VII. Commencement of the Present Litigation

On December 1, 2001, the Perrys filed an amended complaint against Gulf Stream, Mark's RV, and Workhorse,[5] alleging breach of express and implied warranties and violations of Indiana's Deceptive Consumer Sales Act. On May 30, 2003, and on June 4, 2003, respectively, Gulf Stream and Mark's RV filed separate motions for summary judgment. On November 24, 2003, the trial court granted Gulf Stream's and Mark's RV's motions for summary judgment. In so doing, the trial court entered findings of fact and conclusions thereon. On December 17, 2003, the Perrys filed a

**5.** On September 11, 2003, the Perrys moved to voluntarily dismiss their complaint against Workhorse, which the trial court granted with

prejudice. Accordingly, Workhorse is not a party to this appeal.

motion to correct error, which the trial court denied. This appeal by the Perrys ensued.

(Emphases, alterations, and footnotes original; citations to the record omitted.)

The Perrys' amended complaint ("Amended Complaint") at issue in *Perry I* included the following claims and theories of liability:

23. The limited warranty and exclusive remedy provided to the Perrys by the Defendants has failed of its essential purpose.

\* \* \*

26. Defendants have breached the express warranty to repair the vehicle.

27. Defendants have breached the implied warranty of merchantability as to the vehicle.

28. Defendants have failed and refused to return the purchase price to the Perrys.

29. Gulf Stream and Mark's RV, in their advertising and promotional materials, misrepresented the capacity of the vehicle. . . .

\* \* \*

31. Defendants knew, or should have known, of the defective design and condition of the vehicle at the time of sale to the Perrys, and they intentionally concealed such defects from the Perrys.

32. Gulf Stream and Mark's RV made the express and implied warranties to the Perrys at the time of sale knowing that at such time the warranties were untrue and that the vehicle could not be used for its intended purpose.

33. Defendants knew, or reasonably should have known, that the vehicle did not have the performance, characteris-

tics, uses or benefits they represented to the Perrys, in violation of Ind.Code 24–5–0.5–3(a)(1) [the Indiana Deceptive Consumer Sales Act].

34. Defendants' misrepresentation of the capacity of the vehicle was done with the intention of inducing the Perrys to purchase the vehicle.

Appellee's App. at 14–15. Gulf Stream sought summary judgment "on each and every one of the claims set forth in the Plaintiff's [sic] Amended Complaint." *Id.* at 17.

In their brief in response to Gulf Stream's summary judgment motion, the Perrys argued, in support of their theory that Gulf Stream breached an implied warranty of merchantability, that Magnuson–Moss eliminated "the privity requirement between consumers and the giver of a written warranty." *Id.* at 17–18. As such, according to the Perrys, Gulf Stream was not allowed to disclaim the implied warranty of merchantability. In its Reply, Gulf Stream asserted that "the Plaintiffs have not pled, alleged or even mentioned, let alone relied upon, [Magnuson–Moss] in this case." *Id.* at 74. In their Sur-reply, the Perrys countered:

The Amended Complaint states facts sufficient to put Gulf Stream on notice that the Perrys might proceed under this theory and that the provisions of Magnusson–Moss [sic] might be applicable[.] ... [U]nder the facts and circumstances already in evidence, the Magnusson–Moss [sic] Act is applicable to, and controlling in, this case.

*Id.* at 82. Again, the trial court granted Gulf Stream's motion in its entirety.

On appeal in *Perry I*, this court affirmed the trial court's order on Gulf Stream's motion in all respects but one, namely, whether Gulf Stream's Limited Warranty failed of its essential purpose.[6] On that

6. The trial court's order regarding Mark's RV was reversed in part on other grounds, and

issue, we remanded the Perrys' cause against Gulf Stream to the trial court. However, in so holding, we stated that:

> [T]he Magnuson Moss Act does not apply to the controversy at bar. The Magnuson Moss Act provides a cause of action for consumers against suppliers of goods who breach express or implied warranties and limits the extent to which manufacturers may disclaim or modify implied warranties when they give an express warranty. However, that part of Magnuson–Moss forbidding manufacturers from disclaiming implied warranties if they give an express warranty only extends to implied warranties under which they would have been liable to the consumer according to state law. If a manufacturer would not be liable to the consumer under an implied warranty theory because of state law privity requirements, then there is nothing that the manufacturer could improperly disclaim. Accordingly, because Magnuson[-]Moss does not dispose of our state's privity with the remote manufacturer, i.e., Gulf Stream, it is inapplicable to the present controversy.

*Perry I*, 814 N.E.2d at 644 n. 6 (citations omitted). We handed down *Perry I* on August 31, 2004, and the Perrys did not seek rehearing or transfer.

On remand, Gulf Stream filed a motion in limine requesting the trial court prohibit the Perrys from raising any claims other than whether the Limited Warranty failed of its essential purpose. Gulf Stream's motion also asserted that the only remedy still available to the Perrys against Gulf Stream was their loss of the benefit of the bargain; that the Perrys' claims against Workhorse and Mark's RV and the disposition of those claims were inadmissible; that the prior entry of summary judgment and the appellate proceedings therefrom were inadmissible; and that evidence relating to the Motor Home's engine, transmission, brakes, steering, and suspension were not admissible against Gulf Stream.

The trial court held a hearing on Gulf Stream's motion in limine, and, on November 20, 2006, the court entered an order granting that motion in part. Specifically, the court stated that it was granting Gulf Stream's motion:

> regarding Plaintiff's [sic] claims and the only issue before this Court remains "whether the Limited Warranty fails of its essential purpose." All other claims, including those under the Magnuson–Moss Act, were resolved against the Plaintiffs by the opinion of the Trial Court at summary judgment and the Indiana Court of Appeals.

Appellant's App. at 25–26.[7] The trial court certified its order for interlocutory appeal, which we accepted.

---

Mark's RV subsequently reached a settlement with the Perrys.

**7.** The parties' appellate briefs are substantially broader in scope than the ruling of the trial court that is on appeal. Specifically, in addition to whether claims and remedies available under Magnuson–Moss are barred by res judicata, the Perrys make the following contentions: (1) that "Damages for Revocation of Acceptance Are Available to The Perrys Against Gulf Stream," Appellant's Brief at 22, under the issue of whether the Limited Warranty failed of its essential purpose; (2) that the Limited Warranty's "Exclusion of Conse-quential And Incidental Damages Is Unconscionable," *id.* at 26; (3) that "The Past Participants And Prior Adjudication Of This Case Are Neither Irrelevant Nor Inadmissible," *id.* at 29; and (4) that "Gulf Stream Will Not Be Unfairly Prejudiced By Reference To The Motor Home's Alleged Steering, Braking And Handling Problems," *id.* at 30. In response, Gulf Stream argues that the trial court did not abuse its discretion in granting Gulf Stream's motion in limine on each of those issues. But our review of the trial court's order on Gulf Stream's motion does not disclose a ruling on any of those four issues. Rather, the trial

## DISCUSSION AND DECISION

■ The granting or denying of a motion in limine is within the sound discretion of the trial court. *Hopper v. Carey,* 716 N.E.2d 566, 570 (Ind.Ct.App.1999), *trans. denied.* The granting of a motion in limine is an adjunct of the inherent power of trial courts to admit and exclude evidence. *Id.* Ordinarily the denial of a motion in limine can occasion no error; the objectionable occurrence is the improper admission of items in evidence. *Id.* Therefore, the standards of review applicable to questions concerning the admission of evidence must prevail in the case at bar. *Id.* The standard of review for admissibility of evidence issues is abuse of discretion. *Id.* An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Bentley v. State,* 846 N.E.2d 300, 304 (Ind. Ct.App.2006), *trans. denied.*

The Perrys' arguments on appeal center around the question of whether the trial court abused its discretion by not applying our Supreme Court's decision in *Hyundai Motor Am., Inc. v. Goodin,* 822 N.E.2d 947 (Ind.2005), retroactively to their case on remand. In *Hyundai,* our Supreme Court held that "a consumer may sue a manufacturer for economic loss based on breach of the implied warranty of merchantability even if the consumer purchased the product from an intermediary in the distribution chain. There is no requirement of 'vertical' privity for such a claim." *Id.* at 948. The *Hyundai* decision was handed down by our Supreme Court on February 22, 2005, almost six months after this court's opinion in *Perry I.*

Again, in *Perry I* this court explained that Magnuson–Moss did not apply to the Perrys' claims because the Perrys were unable to satisfy Indiana's privity require-

ments. *See Perry I,* 814 N.E.2d at 644 n. 6. The Perrys argue that this court, in *Perry I,* "only mentioned [Magnuson–Moss] in a footnote [and therefore Magnuson–Moss] was not considered a necessary part of the issues." Appellant's Brief at 18. But the Perrys ignore the fact that, in *Perry I,* they argued to the trial court both that Magnuson–Moss eliminated "the privity requirement between consumers and the giver of a written warranty" and that "the Magnusson–Moss [sic] Act is applicable to, and controlling in, this case." Appellee's App. at 17–18, 82. Having pressed the applicability of Magnuson–Moss to the trial court, the Perrys cannot now maintain an inconsistent position. *See, e.g., Mitchell v. Falter,* 126 Ind.App. 34, 126 N.E.2d 769, 774 (1955) ("Generally speaking a party will not be permitted ... to take a position in regard to a matter which is ... inconsistent with one previously assumed...."). *See also Wabash Grain, Inc. v. Smith,* 700 N.E.2d 234, 237 (Ind.Ct. App.1998), *trans. denied.* Thus, it is clear that Magnuson–Moss was at issue in *Perry I.*

In *Hyundai,* our Supreme Court eliminated those privity requirements and effectively abrogated that holding in *Perry I.* As such, the Perrys now seek to raise claims under Magnuson–Moss, and they contend that the trial court abused its discretion in granting Gulf Stream's motion in limine without considering *Hyundai.* We cannot agree.

As an initial matter, the parties dispute whether the Perrys' attempt to reincorporate claims and remedies under Magnuson–Moss are dictated by principles of res judicata or law of the case. Actually, both doctrines apply here. As we have stated in similar circumstances:

court granted Gulf Stream's motion only regarding the scope of the Perrys' permissible

claims. Thus, we limit our review on the appeal of that order to only that issue.

Having been before the Supreme Court, we must bear in mind that the decision and rulings made by that court upon the first appeal settle definitely for the purposes of the litigation, all questions adjudicated[,] and such decision is the "law of the case"; also, the Supreme Court's judgment on the former appeal is res judicata against the parties of record thereto, with respect to all matters in issue and determined therein. A second[ ] or subsequent appeal or review only brings up for review the proceedings subsequent to the reversal or remand, and all questions presented on the first appeal, including jurisdictional questions, will not be considered on the second appeal; also, all rulings on questions not expressly affirmed or reversed will be deemed impliedly affirmed.

*Daviess–Martin County Rural Tel. Corp. v. Pub. Serv. Comm'n,* 132 Ind.App. 610, 174 N.E.2d 63, 64 (1961) (citations omitted). *See also Fairfield Dev., Inc. v. Georgetown Woods Senior Apartments,* 768 N.E.2d 463, 475–76 (Ind.Ct.App.2002), *trans. denied.* However, whereas the law of the case doctrine "directs discretion, [res judicata] supersedes it and compels judgment." *State v. Lewis,* 543 N.E.2d 1116, 1118 (Ind.1989) (quoting *S. Ry. Co. v. Clift,* 260 U.S. 316, 319, 43 S.Ct. 126, 67 L.Ed. 283 (1922)).

 Res judicata serves to prevent repetitious litigation of disputes that are essentially the same. *Dawson v. Estate of Ott,* 796 N.E.2d 1190, 1195 (Ind.Ct.App. 2003). "Nor are the res judicata consequences of a final, unappealed judgment on the merits altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case." *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981). *See Bd. of Comm'rs v. State ex rel. Gibson,* 226 Ind.

633, 82 N.E.2d 891, 892 (1948). To hold otherwise would constitute an "unprecedented departure from accepted principles of res judicata." *Moitie,* 452 U.S. at 399, 101 S.Ct. 2424.

 The doctrine of res judicata consists of two distinct components, claim preclusion and issue preclusion. *Dawson,* 796 N.E.2d at 1195.

Claim preclusion is applicable when a final judgment on the merits has been rendered and acts to bar a subsequent action on the same claim between the same parties. When claim preclusion applies, all matters that were *or might have been litigated* are deemed conclusively decided by the judgment in the prior action. Claim preclusion applies when the following four factors are present: (1) the former judgment was rendered by a court of competent jurisdiction; (2) the former judgment was rendered on the merits; (3) the matter now at issue was, *or could have been,* determined in the prior action; and (4) the controversy adjudicated in the former action was between parties to the present suit or their privies.

*Id.* (emphases added) (citations omitted). Thus, all issues decided directly or implicitly in a prior appellate decision are binding in all subsequent portions of the same case. *Fairfield Dev.,* 768 N.E.2d at 476.

 In contrast to claim preclusion, issue preclusion "applies where the causes of action are not the same, but where some fact or question has been determined and adjudicated in the former suit, and the same fact or question is again put in issue in a subsequent suit between the same parties." *Peterson v. Culver Educ. Found.,* 402 N.E.2d 448, 460 (Ind.Ct.App. 1980). And under the discretionary law of the case doctrine, an appellate court's determination of a legal issue is binding in subsequent appeals given the same case

and substantially the same facts. *Fairfield Dev.*, 768 N.E.2d at 476.

The Perrys' attempts to once again pursue claims and remedies arising under Magnuson–Moss are controlled by the doctrine of claim preclusion. There is no dispute as to the jurisdiction of this court or the trial court over the Perrys' claims, nor is there any dispute that the Perrys and Gulf Stream are the same parties present in the *Perry I* proceedings. However, the Perrys do contest whether there has been a prior judgment on the merits of whether Magnuson–Moss is applicable here and, as such, whether the matter now at issue was determined in the prior action. "Final judgments dispose the subject matter of the litigation as to the parties so far as the court in which the action is pending has the power to dispose of it." *Pond v. McNellis*, 845 N.E.2d 1043, 1054 (Ind.Ct.App.2006) (quoting *Adams v. Marion County Office of Family and Children*, 659 N.E.2d 202, 205 (Ind.Ct.App.1995)), *trans. denied.*

In *Perry I*, the Perrys specifically contended that their implied warranty of merchantability claim survived summary judgment because Magnuson–Moss allowed them to satisfy Indiana's privity requirements. The trial court rejected that argument and, on appeal, this court expressly determined "that the Magnuson Moss Act does not apply to th[is] controversy." *Perry I*, 814 N.E.2d at 644 n. 6. As our conclusion was essential to addressing the Perrys' implied warranty of merchantability claim, that conclusion, even though in a footnote, was a final judgment on the merits of Magnuson–Moss' applicability to the Perrys' cause of action. Because the matter now at issue—whether the Perrys can seek claims and remedies under Magnuson–Moss—was determined in the prior action, claim preclusion bars the Perrys'

attempts to relitigate issues arising from the application of Magnuson–Moss.

Nonetheless, the Perrys contend that their Magnuson–Moss claims are not barred by res judicata because there was never an explicit "former adjudication" on their original Magnuson–Moss arguments. Appellant's Brief at 15. Similarly, the Perrys maintain that this court's statement regarding the applicability of Magnuson–Moss in *Perry I* was merely dicta. But the Perrys incorrectly apply principles of issue preclusion to support those positions. Again, the Perrys' attempts to relitigate an identical cause of action in the same court and against the same party raises concerns of claim preclusion, not issue preclusion. *See Fairfield Dev.*, 768 N.E.2d at 476. As claim preclusion applies, "all matters that were *or might have been litigated* are deemed conclusively decided by the [prior] judgment." *Dawson*, 796 N.E.2d at 1195. Thus, an explicit holding stating the grounds for the dismissal of the Perrys' implied warranty of merchantability claim in *Perry I* is not required. In any event, as discussed above, the Magnuson–Moss issue was before the trial court and this court in *Perry I*, and this court explicitly stated that Magnuson–Moss did not apply to the Perrys' cause of action.

The Perrys also argue that "[w]hen a judgment in a civil case is reversed on appeal, as [was the case in *Perry I* ], the judgment is not entitled to preclusive effect." Appellant's Brief at 15. In support of that position, the Perrys cite *Northern Indiana Commuter Transportation District v. Chicago SouthShore & South Bend Railroad*, 685 N.E.2d 680, 689 (Ind.1997). But that case involved a question of what constituted a "final judgment" under Illinois law and is, therefore, inapposite. In any event, the Perrys' proposition applies only to the trial court's order reversed by the appellate court, not to the appellate

court's decision. *See Meeker v. Payne,* 101 Ill.App.3d 723, 57 Ill.Dec. 64, 428 N.E.2d 614, 615 (Ill.App.Ct.1981) ("Since *the judgment of the trial court* had been reversed, it was a nullity and could not *afterwards be pleaded in bar* as an adjudication." (emphases added)) (*cited in N. Ind. Commuter Trans. Dist.,* 685 N.E.2d at 689). As the Perrys' provide no further cogent reasoning on this point, that argument is waived. *See* Ind. Appellate Rule 46(A)(8)(a).

Finally, the Perrys argue that the established principles of res judicata must be set aside in light of a subsequent change in Indiana law, namely, our Supreme Court's opinion in *Hyundai.* Again, the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case does not vitiate its res judicata effect. *See Moitie,* 452 U.S. at 398, 101 S.Ct. 2424; *Gibson,* 82 N.E.2d at 892. To hold otherwise would promote the repetitious litigation of identical disputes that res judicata serves to prevent. *See Dawson,* 796 N.E.2d at 1195.

We hold that the Perrys' attempts to assert issues arising from the application of Magnuson–Moss are barred by the doctrine of claim preclusion. Thus, we need not address whether those issues fall within an exception to the law of the case doctrine. *See Lewis,* 543 N.E.2d at 1118. By now arguing that *Hyundai* applies, the Perrys are essentially seeking to apply *Hyundai* retroactively and relitigate Magnuson–Moss in their cause of action. But this court has already held that Magnuson–Moss does not apply to the Perrys' claims. Therefore, the claim preclusion branch of res judicata bars the retroactive application of *Hyundai* to this case and the subsequent relitigation of any Magnuson–Moss issues. *See Fairfield Dev.,* 768 N.E.2d at 476. As such, we cannot say

that the trial court abused its discretion in granting Gulf Stream's motion in limine.

Affirmed.

RILEY, J., and BARNES, J., concur.