Kevin D. BURKE, Appellant–Petitioner,

v.

Duke BENNETT, Appellee–Respondent.

No. 84A01–0801–CV–2.

Court of Appeals of Indiana.

Nov. 13, 2008.

Edward O. DeLaney, Amanda Couture, DeLaney & DeLaney, Indianapolis, IN, Attorneys for Appellant.

Terry R. Modesitt, Chou–Il Lee, Terre Haute, IN, George T. Patton, Jr., Bryan H. Babb, Bose McKinney & Evans, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BROWN, Judge.

Kevin Burke appeals the trial court's denial of his petition contesting the election of Duke Bennett for mayor of Terre Haute. Burke raises one issue, which we revise and restate as:

I. Whether Bennett was ineligible under Indiana's election contest statutes; and

II. Whether Burke must be declared elected pursuant to Ind.Code § 3–12–8–17.

On cross appeal, Bennett raises one issue, which we revise and restate as whether Bennett was subject to the Little Hatch Act, 5 U.S.C. § 1502.[1] We reverse and remand.[2]

The relevant facts follow. In September 2005, Bennett began working full time as the Director of Operations at the Hamilton Center, Inc. ("Hamilton Center"), which is a not-for-profit organization established for the purpose of providing behavioral health services. Bennett also worked part time as a high school and college sports official, but the majority of his compensation came from his employment at the Hamilton Center. The Hamilton Center operated a Head Start program in 2007 and received federal funds. The Hamilton Center received a grant of $861,631 for fiscal year 2007[3] from the Department of Health and Human Services for the Head Start program. As part of the Head Start grant, the Hamilton Center received $125,789 for the "Early Head Start program's proportionate share of costs related to security, payroll, maintenance department, Human Resources, Employee Health Services, Information Systems, Liability Insurance and other administrative services." Petitioner's Exhibit 10 at 4. Bennett was responsible for security, maintenance, developing policies and procedures for purchasing and materials management, and budgeting the facilities and security program for the Hamilton Cen-

---

1. Oral argument was held on July 8, 2008.

2. We note that the Statement of Facts section of Burke's appellate brief contains some argument. We remind Burke that the Statement of Facts section "shall describe the facts relevant to the issues presented for review," is to be a narrative statement of facts, and is not to be argumentative. Ind. Appellate Rule 46(A)(6); *Parks v. Madison County*, 783 N.E.2d 711, 717 (Ind.Ct.App.2002), *reh'g denied, trans. denied.*

3. Fiscal year 2007 ran from July 1, 2007 to June 30, 2008.

ter's programs, including the Hamilton Center's Head Start program.

The Hamilton Center's Head Start programs are located in an office "in the building at 500 8th Avenue" and they have "two daycares at 36 South 14th Street and 42 South 15th Street." Transcript at 79. Anita Lascelles was an employee of the Hamilton Center and was responsible for its Head Start program. Lascelles would "generally" initiate the request for maintenance and repairs of the Head Start facilities by contacting Bennett's operation. *Id.* at 42. Lascelles would sometimes talk directly with Bennett about requests that she needed fulfilled for the Head Start program.

Bennett approved specific projects, work orders, and contracts for the Head Start program. In 2007, Bennett signed contracts or purchase requisition forms for maintenance and improvements to the Head Start facilities. Specifically, Bennett signed a contract for concrete work in the amount of $10,875 at one of the Head Start facilities. Bennett signed purchase requisition forms for annual maintenance of the HVAC systems at two of the Head Start facilities in the amount of $126 each. Bennett also signed a mowing contract for all three of the Head Start facilities for approximately thirty cuttings at a rate of $25 per cutting at two of the facilities and $55 per cutting at the third facility. Bennett signed a purchase requisition form for a new hot water heater for one of the Head Start facilities in the amount of $593. Bennett signed a purchase requisition form for a roof for one of the Head Start facilities, and the Hamilton Center paid a

$1,600 down payment. Bennett signed a purchase requisition form for masonry restoration and repair in the amount of $3,240. Bennett also signed a snow removal contract for two of the Head Start facilities at $55 per occurrence. It was typical for Bennett to approve these contracts. The Operations Department, of which Bennett was the Director, also supported the Head Start program at the Hamilton Center by performing maintenance activities, security activities, delivering mail, and purchasing at the request of the department.[4]

In 2007, Bennett ran for mayor of Terre Haute against Burke. Bennett won the election. At some point after the election, John Tschoe, a federal employee and regional Head Start contact, contacted the Hamilton Center regarding Bennett's financial compensation. The Hamilton Center calculated that $2,041 or 1.84% of Bennett's salary and benefits for "2006/2007" could be attributable to the federal grant provided to the Head Start program. Petitioner's Exhibit 15. The Hamilton Center also calculated that the federal Head Start grant constituted $6,466 of the total budget of $351,118.96 for "Facilities & Security," a program directed by Bennett. *Id.*

On November 19, 2007, Burke filed a petition contesting the election pursuant to Ind.Code § 3–12–8–2 and Ind.Code § 3–12–8–6. Burke alleged that the Little Hatch Act, 5 U.S.C. § 1501 *et seq.*, and Ind.Code § 3–8–1–5(c)(6) rendered Bennett ineligible to run for or to be elected to the office of mayor of Terre Haute.[5]

---

4. These are the same services that the Operations Department provided to every other unit within Hamilton Center.

5. On December 17, 2007, Bennett sought to remove the action to the United States District Court for the Southern District of

Indiana. Burke filed an emergency motion with the district court to remand the case to state court. The district court granted Burke's motion to remand because Burke's petition was "based entirely on state election law claims, one of which incorporates a federal statute" and the Little Hatch Act "does

Bennett filed a motion to dismiss Burke's petition and argued that the trial court could not conclude that Bennett had violated the Little Hatch Act without "an investigation and final determination of the [Office of Special Counsel] and the Merits Board." Appellee's Appendix at 45. Burke filed a response to Bennett's motion and argued that Bennett sought to have the trial court "undermine its own authority by reading into the Indiana Election Code a requirement that independent Federal agencies act first and in a way that would control [the trial court]'s imposition of an Indiana remedy." *Id.* at 56. The trial court denied Bennett's motion to dismiss.

After an evidentiary hearing, the trial court entered the following order:

\* \* \* \* \*

### DISCUSSION AND ANALYSIS

The Hatch Act, 5 U.S.C. 7321–7326, and the Little Hatch Act, 5 U.S.C. § 1501 *et seq.*, govern the political activity of certain governmental employees. Covered employees are prohibited, amongst other things, from being candidates for a partisan public offices [sic].

5 U.S.C. § 1502 provides that:

(a) A state or local officer or employee may not—

(1) use his official authority or influence for the purpose of interfering with or affecting the result of an election or a nomination for office;

(2) directly or indirectly coerce, attempt to coerce, command, or advise a State or local officer or employee to pay, lend, or contribute anything of value to a party, committee, organization, agency, or person for political purposes; or

(3) be a candidate for elective office.

The Hatch Act applies to officers and employees of State and local governmental agencies whose activities are financed in whole or in part by loans or grants made by the United States or a Federal agency. 5 U.S.C. § 1501(4); *but see* 5 U.S.C. § 1502(c) (excluding incumbents, such as the serving Mayor, from Hatch Act coverage).

The Hatch Act was originally enacted in 1939, "in response to controversies over coercion of political donations from federal employees and the misuse of federal funds in the 1936 and 1938 campaigns." [Scott J. Bloch, *The Judgment of History: Faction, Political Machines, and the Hatch Act,* 7 U. Pa. J. Lab. & Emp. L. 225, 231 (2005)]. "Preventing corruption, ensuring a professional civil service, preserving respect for the government, and protecting employees from being coerced into political activity are the most cited reasons for the Act." *Id.* at 271.

Employees of private, nonprofit agencies are subject to the Hatch Act if a statutory source of the agency's federal funding specifically states that employees of the recipient organization are State or local government employees for purposes of the Act. The statutes authorizing Head Start Grants specify that recipients of the grants are State or local government agencies for the purposes of the Hatch Act.

The statute that applies the Hatch Act to Head Start Grant recipients is 42 U.S.C. § 9851, which states: "[f]or purposes of Chapter 15 of title 5, United States Code [ ] any agency which assumes responsibility for planning, devel-

not give rise to an independent cause of action against an alleged violator of its provi- sions." Appellee's Appendix at 131.

oping, and coordinating Head Start programs and receives assistance under this subchapter shall be deemed a State or local agency." An agency that operates a Head Start program and receives federal grants to assist with the program is treated as a local government agency funded through Federal grants or loans, meaning that the agency and its employees' political activities are subject to the restrictions of the Hatch Act.

"State or local officer of [sic] employee" is defined under 5 U.S.C. § 1501(4) as:

> an individual employed by a State or local agency whose principal employment is in connection with an activity which is financed in whole or in part by loans or grants made by the United States or a Federal agency, but does not include—

(A) an individual who exercises no functions in connection with that activity; or

(B) an individual employed by an educational or research institution, establishment, agency or system which is supported in whole or in part by a State or political subdivision thereof, or by a recognized religious, philanthropic, or cultural organization.

"It has long been established that an officer or employee of a state or local agency is subject to the Hatch Act if, as a normal and foreseeable incident of his principal position or job, he performs duties in connection with an activity financed in whole or in part by federal funds." September 27, 1996 opinion letter from OSC Director of Legislative and Public Affairs Michael G. Lawrence (citing *In re: Hutchins*, 2 P.A.R. 160, 164 (1944); *Special Counsel v. Gallagher*, 44 M.S.P.R. 57 (1990). (*Gallagher*); *Hutchins* opinion unavailable.)

The OSC defines "principal employment," as used in 5 U.S.C. § 1501(4), as "that employment to which an individual devotes the most time, and from which he derives the most income." June 5, 1996 opinion letter from OSC Senior Trial Attorney Ralph B. Eddy (citing *Anderson v. U.S. Civil Service Commission*, 119 F.Supp. 567, 567–577 (D.Mont. 1954); *Matturi v. U.S. Civil Service Commission*, 130 F.Supp. 15, 16–17 (D.N.J.1955), *aff'd*, 229 F.2d 435 (3rd Cir.1956); *Smyth v. U.S. Civil Service Commission*, 291 F.Supp. 568 (E.D.Wis. 1968)).

Duke Bennett's job as the Director of Operations for the Hamilton Center is his principal employment.

The Hatch Act applies to the Hamilton Center, because it is an "agency which assumes responsibility for planning, developing, and coordinating Head Start programs." 42 U.S.C. § 9851.

Bennett's job is "financed in whole or in part by loans or grants made by the United States or a Federal agency." 5 U.S.C. § 1501(4). Specifically, $2,041 of Bennett's salary and benefits for this fiscal year were charged directly to the Hamilton Center's Head Start grant, although such calculation tracing the funds to Bennett was not undertaken until after the 2006 general election. Based on Bennett's job description, testimony at the December 18 hearing, and the evidence in the record, Bennett performs functions in connection with the Hamilton Center's Early Head Start program making him subject to the Act.

The inquiry does not end with the determination of whether a candidate is subject to the Hatch Act. Burke contends that if Bennett is subject to the Hatch Act he is precluded from assuming office. An examination of I.C. 3–8–1–5(c) fails to support Burke's conten-

tion. IC 3–8–1–5(c), in relevant part, states that a person is disqualified "from assuming or being a candidate for elected office if: (6) the person is subject to: (A) 5 U.S.C. § 1502 (the Little Hatch Act); . . . and would violate either federal statute by becoming or remaining the candidate of a political party for nomination or election to an elected office or a political party office."

Several options are available to challenge the qualifications of a candidate. Ind.Code 3–8–1–2(c) and (e) permits [sic] a County Election Board, upon the filing of a Declaration of Candidacy, to determine whether a candidate is qualified to seek office. Qualifications may be challenged by a voter in the district (3–8–1–2(c)). The County Election Board also has the authority to investigate and conduct a hearing regarding the alleged violation of any provision of the election laws. I.C. 3–6–5–31. *Wilson v. Montgomery County Election Board,* 642 N.E.2d 258, (Ind. App.[1994]). Neither Burke, nor anyone else, sought to have Bennett disqualified from being a candidate for office.

Instead, after the election, Burke filed this contest action and asks the Court to find that Bennett was ineligible. Burke further requests that should the Court determine Bennett was ineligible he be certified the eligible candidate receiving the most votes and, therefore, remain Mayor of Terre Haute (I.C.3–12–8–17); see also (*Patterson v. Dykes,* 804 [N.E.2d] 849, (Ind.App.2004)). I.C. 3–8–1–5 (2005) governs disqualification of candidates.

The statute lists six (6) basis [sic] for disqualifying one from assuming or being a candidate for an elected office. The statute provides:

Sec. 5 (a) This section does not apply to a candidate for federal office.

(b) As used in this section, "felony" means a conviction in any jurisdiction for which the convicted person might have been imprisoned for at least one (1) year. However, the term does not include a conviction:

(1) for which the person has been pardoned; or

(2) that has been:

(A) reversed;

(B) vacates; [sic]

(C) set aside; or

(D) not entered because the trial court did not accept the person's guilty plea.

(c) A person is disqualified from assuming or being a candidate for an elected office if:

(1) the person gave or offered a bribe, threat, or reward to procure the person's election, as provided in Article 2, Section 6 of the Constitution of the State of Indiana;

(2) the person does not comply with IC 5–8–3 because of a conviction for a violation of the federal laws listed in that statute;

(3) in a:

(A) jury trial, a jury publicly announces a verdict against the person for a felony;

(B) bench trial, the court publicly announces a verdict against the person for a felony; or

(C) guilty plea hearing, the person pleads guilty or nolo contendere to a felony;

(4) the person has been removed from the office the candidate seeks under Article 7, Section 11 or Article 7, Section 13 of the Constitution of the State of Indiana;

(5) the person is a member of the United States armed forces on active duty and prohibited by the United States Department of Defense from being a candidate; or

(6) the person is subject to:

(A) 5 U.S.C. 1502 (the Little Hatch Act); or

(B) 5 U.S.C. 7321–7326 (the Hatch Act); and would violate either federal statute by becoming or remaining the candidate of a political party for nomination or election to an elected office or a political party office.

(d) The reduction of a felony to a Class A misdemeanor under IC 35–50–2–7 or IC 35–38–1–1.5 does not affect the operation of subsection (c).

Subsections one and three are based on the Indiana Constitution. Subsection (1) prohibits a candidate who gave or offered a bribe to get elected from assuming office or being a candidate. Subsection (4) prohibits one who is removed from office from running for that office again. Subsections (2) and (3) concern convictions for felony charges and certain federal charges. Subsection (5) concerns prohibitions by the Federal Government Department of Defense for members of the United States armed forces on active duty. Subsections (1), (2)[sic] and (3) have been the subject of prior litigation that reached the appellate stage. *Fields v. Nicholson,* 197 Ind. 161, 150 N.E. 53 ([1926]). *Taylor v. State Election Board,* 616 N.E.2d 380 (Ind.App.1993). *Wilson v. Montgomery County Election Board,* 642 N.E.2d 258 (Ind.App.[1994]). *Patterson v. Dykes,* 804 N.E.2d 849 (Ind.App.2004). [*Tinkle*] *v. Wallace,* 1906, 79 N.E. 355, [167 Ind. 382]. Subsections (4) and (5) are straightforward and present no particu-

lar problems in their meaning or application.

Subsection (6), however, has no Indiana case law construing it in this jurisdiction and no case law has been provided or found from another jurisdiction construing similar language. Subsection (6) applies to individuals subject to the Little Hatch Act 5 USC 1502 and 5 USC 7321–7326 the Hatch Act. Such makes this a case of first impression.

Although the Court finds Bennett was subject to the Hatch Act, it is clear that the violation was not willful or intentional. Whether Bennett was blissfully ignorant, lulled into believing the Act did not apply to him by virtue of his three previous election bids (Primary 2003, General 2003 and Primary 2007), relied upon his own research, conversations with Hamilton Center CEO, discussions with his campaign committee, his conclusion that the Hatch Act does not apply to him was erroneous.

No evidence indicates Bennett willfully flouted the Act. No one from Office of Special Counsel informed him that he was precluded from running. No one from Hamilton Center told him the Act precluded him from being a candidate. His role with Early Head Start was essentially nonexistent. Hamilton Center did not consider Bennett an employee of Early Head Start. Bennett approved work orders for minor repairs on two facilities. It appears that only after the initiating of this litigation and after Hamilton Center was forced to calculate the apportionment of overhead was it revealed or discovered that part of Bennett's salary was attributed to the Early Head Start grant award. The Hatch Act has administrative penalties provisions which allow the imposition of sanctions on a violation, including requiring termination of the employee and penal-

ties against an agency for failing to remove the employee.

The question for the Court to decide herein is whether Bennett is disqualified from assuming office. Burke conceded at the contest trial that this is the issue herein. Bennett cannot be disqualified under IC 3–8–1–5(c) because he is no longer a candidate and does not intend to become one within the immediate future. The mayor election is over and he has, pursuant to a certificate of election, been declared the winner. As such, he is mayor-elect, not a candidate, and does not fall within the scope of IC 3–8–1–5(c)'s candidacy requirement. Bennett cannot be disqualified under IC 3–8–1–5(c) because he has not yet assumed office and will not do so until January 1, 2008. Mayor of Terre Haute is a full-time position. At the time of taking mayoral office, Bennett will no longer be employed at the Hamilton Center. Thus, when he is assuming office, he will no longer be employed by the Hamilton Center and, consequently, will not be subject to the Little Hatch Act. He does not yet fall within the reach of IC 3–8–1–5(c). The Little Hatch Act prohibition against being a candidate for elective office does not apply to the Mayor of a city or an individual holding elective office.

Indiana case law has previously addressed whether a candidate who was disqualified from running could assume office provided the disqualifying basis had been remedied. *Hoy v. State,* 1907, [168] Ind. 506, 81 N.E. 509 (1907), concerned the 1905 election for city council in Lebanon. Two council members were to be elected from the four candidates. The third place finisher alleged that since the second place finisher was an officer of a company that had a contract with the city, making him ineligible to occupy any office pursuant to statute, the third place finisher should be deemed elected. The Court held that ineligibility must exist at the time the term of the office begins, *Hoy* [168 Ind.] at 513, 81 N.E. 509 citing *Smith v. Moore* (1883), 90 Ind. 294. *Connell v. State ex rel.* (1925) 196 Ind. 421, 148 N.E. 407 confirmed that such remained the law in Indiana, although not directly deciding the issue.

> ... where claimants were ineligible to the offices sought at the time of being elected thereto by reason of having voluntarily borne arms against the United States, or because they were capable of procuring the disability to be removed, and had become eligible when the time arrived for taking possession of their offices, qualifying and entering upon the performance of their official duties, the Court of Indiana and of many other states have held them eligible to fill such offices (*citations omitted* ).

Several other cases addressing the issue turn on the issue of whether the electorate was aware of the disqualification (e.g. *State ex. Rel. v. Ross* (1908), 170 Ind. 704, 84 N.E. 150; *Fields v. Nicholson* (1926) 197 Ind. 161, 150 N.E. 53; *State ex.[ ]rel v. Clawson* (1907), 169 Ind. 61, 82 N.E. 69). Here, neither Bennett, his employer, his opponent or the electorate knew of the Hatch Act violation.

The only recent case that discusses the issue of a disqualified candidate is *Patterson v. Dykes,* 804 N.E.2d 849 (Ind.App.2004). Patterson and Dykes ran against each other in the 2004 general election for a seat on Madison County Council. Dykes, the incumbent, lost to Patterson by 450 votes. Following the election, Dykes filed suit seeking declaratory judgment and permanent injunction that Patterson was ineligible to

hold office because of a prior felony conviction. The court found Patterson ineligible to assume office and ordered Dykes to hold over the seat for another term.

One argument posited by Patterson was that he was seeking a pardon from the Governor and that should the pardon be received he would be eligible to serve. The Court rejected the argument and in dicta found that if [sic] would be against public policy to allow a post election pardon to make a candidate eligible to serve.

The facts in the case at bar are clearly distinguishable from Patterson.

Bennett is eligible to assume office, and should prevail in this Contest.

### JUDGMENT

Comes now the Court, and pursuant to Ind.Code 3–12–8–16, and declares as elected Duke A. Bennett as the qualified candidate who received the highest number of votes in the 2007 general election of the Office of Mayor of the City of Terre Haute and renders judgment accordingly.

Appellant's Appendix at 13–22.

 Before addressing the issues, we note that, in the appellate review of claims tried without a jury, the findings and judgment are not to be set aside unless clearly erroneous, and due regard is to be given to the trial court's ability to assess the credibility of the witnesses. *Fraley v. Minger,* 829 N.E.2d 476, 482 (Ind.2005); Ind. Trial Rule 52(A). A judgment is clearly erroneous when there is no evidence supporting the findings or the findings fail to support the judgment and when the trial court applies the wrong legal standard to prop-

erly found facts. 829 N.E.2d at 482. While findings of fact are reviewed under the clearly erroneous standard, appellate courts do not defer to conclusions of law, which are reviewed de novo. *Id.* In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made. *Id.*

### I.

 The first issue is whether Bennett was ineligible under Indiana's election contest statutes.[6] At the outset, we note that "[i]t is a serious matter under our system of government to deprive one of an office for which he has received the highest number of votes." *Oviatt v. Behme,* 238 Ind. 69, 78, 147 N.E.2d 897, 902 (1958).

This case requires that we interpret Indiana's election contest statutes. When interpreting a statute, we independently review a statute's meaning and apply it to the facts of the case under review. *Bolin v. Wingert,* 764 N.E.2d 201, 204 (Ind.2002). Thus, we need not defer to a trial court's interpretation of the statute's meaning. *Elmer Buchta Trucking, Inc. v. Stanley,* 744 N.E.2d 939, 942 (Ind.2001). "The first step in interpreting any Indiana statute is to determine whether the legislature has spoken clearly and unambiguously on the point in question." *St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele,* 766 N.E.2d 699, 703–704 (Ind.2002). If a statute is unambiguous, we must give the statute its clear and plain meaning. *Bolin,* 764 N.E.2d at 204. A statute is unambiguous if it is not susceptible to more than one interpretation. *Elmer Buchta Trucking,* 744 N.E.2d at 942. However, if a statute is susceptible to multiple interpretations,

---

**6.** We incorporate the issue raised by Bennett on cross appeal, whether Bennett was subject to the Little Hatch Act, into this issue.

we must try to ascertain the legislature's intent and interpret the statute so as to effectuate that intent. *Bolin*, 764 N.E.2d at 204. We presume the legislature intended logical application of the language used in the statute, so as to avoid unjust or absurd results. *Id.*

This case involves Ind.Code § 3–8–1–5 (Supp.2005), which governs the disqualification of candidates and provides, in part:

\* \* \* \* \*

(c) A person is disqualified from assuming or being a candidate for an elected office if:

\* \* \* \* \*

(6) the person is subject to:
(A) 5 U.S.C. 1502 (the Little Hatch Act); or
(B) 5 U.S.C. 7321–7326 (the Hatch Act);
and would violate either federal statute by becoming or remaining the candidate of a political party for nomination or election to an elected office or a political party office.

We first address Bennett's arguments that: (A) the Office of Special Counsel ("OSC") has exclusive jurisdiction; and (B) Bennett was not subject to the Little Hatch Act. We will then address Burke's claim that Bennett was ineligible under Indiana's election contest statutes.

A. *Jurisdiction*

The OSC conducts investigations of allegations concerning Little Hatch Act violations. *See* 5 U.S.C. § 1216 (providing that the OSC "shall ... conduct an investigation of any allegation concerning ... political activity prohibited under chapter 15, relating to political activities by certain State and local officers and employees...."). Bennett cites *Sims v. Gov't of the District of Columbia*, 6 MSPB 652, 7 M.S.P.R. 45 (1981), for the proposition that the OSC's jurisdiction is "exclusive and non-delegable." Appellee's Brief at 33. We do not find *Sims* dispositive. In *Sims*, a City Administrator removed Dr. Nathaniel Sims, the Chief Hearing Examiner of the District of Columbia Rental Accommodations Office, from his position after finding that he had violated the Hatch Act. 6 MSPB at 652, 7 M.S.P.R. at 46. Sims appealed his removal to the Merit Systems Protection Board ("MSPB"). *Id.* The administrative law judge ("ALJ") dismissed the appeal on the ground that the MSPB lacked jurisdiction. *Id.* Specifically, the ALJ found that the MSPB was empowered to act on alleged Hatch Act violations only after the OSC filed a complaint with the MSPB and the OSC had not initiated the action against Sims. *Id.* Sims petitioned the MSPB for review of the order dismissing the appeal. *Id.* at 653, 7 M.S.P.R. at 47. The MSPB concluded that the OSC had "sole authority to initiate actions alleging prohibited political activity; therefore the [MSPB]'s jurisdiction can be invoked only by the Special Counsel." *Id.* at 654, 7 M.S.P.R. at 48. The MSPB also held that the OSC "has exclusive authority ... to investigate and prosecute" violations of the Little Hatch Act and the MSPB "has only original jurisdiction to discipline Hatch Act violations." *Id.* at 659, 7 M.S.P.R. at 54.

■ Here, we are not enforcing the Little Hatch Act or its remedies.[7] Rather, we

---

7. The Little Hatch Act provides for the withholding of federal funds if a state opts not to remove an employee who violates the Little Hatch Act. *See* 5 U.S.C. § 1506 ("When the Merit Systems Protection Board finds—(1) that a State or local officer or employee has not been removed from his office or employment within 30 days after notice of a determination by the Board that he has violated section 1502 of this title and that the violation warrants removal; or (2) that the State or local officer or employee has been removed

are addressing Ind.Code § 3–8–1–5, which provides that a person is disqualified from assuming or being a candidate for an elected office if "the person is subject to ... 5 U.S.C. 1502 (the Little Hatch Act) ... and *would violate* either federal statute by becoming or remaining the candidate of a political party for nomination or election to an elected office or a political party office." (Emphasis added). Thus, even assuming that the OSC has exclusive jurisdiction over Little Hatch Act violations, Ind.Code § 3–8–1–5 does not require an OSC determination that Bennett violated the Little Hatch Act, but only requires a finding that Bennett was subject to the Little Hatch Act and that Bennett's becoming or remaining a candidate *would violate* a federal statute.[8] *See* Ind.Code § 3–8–1–5.

**B.** *Whether Bennett Was Subject to and Violated the Little Hatch Act*

We now turn to whether Bennett was subject to the Little Hatch Act. We begin by noting that resolution of the issue turns on the interpretation of a federal statute, the Little Hatch Act. The Indiana Supreme Court has held that "[a]lthough U.S. Supreme Court decisions pertaining to federal questions are binding on state courts, lower federal court decisions may be persuasive but have non-binding authority on state courts." *Ind. Dep't of*

*Pub. Welfare v. Payne,* 622 N.E.2d 461, 468 (Ind.1993) (citing *Pennsylvania R.R. Co. v. F.E. Mathias Lumber Co.,* 113 Ind. App. 133, 136, 47 N.E.2d 158, 159 (1943)), *reh'g denied.* In *F.E. Mathias Lumber,* the court held:

"Where a question is federal in its nature, the decisions of the supreme court of the United States are absolutely binding on the various state courts and must be followed." 21 C.J.S., Courts, p. 365, § 206; 15 C.J., p. 930, § 318. While there is a conflict as to whether the decisions of the lower federal courts are binding on state courts, the weight of authority is, that while such decisions have a persuasive authority, they are not binding on the state courts. This is certainly true when the decisions of such federal courts themselves are in conflict. 21 C.J. S., Courts, p. 377, § 206; *Brown v. Palmer Clay Products Co.,* 1935, 290 Mass. 108, 195 N.E. 122, 123; *State ex rel. v. Taylor,* 1923, 298 Mo. 474, 251 S.W. 383, 387.

*F.E. Mathias Lumber Co.,* 113 Ind.App. at 136–137, 47 N.E.2d at 159.

The Little Hatch Act, 5 U.S.C. § 1502(a), provides, in part, that "[a] State or local officer or employee may not ... be a candidate for elective office."[9] Bennett

---

and has been appointed within 18 months after his removal to an office or employment in the same State in a State or local agency which does not receive loans or grants from a Federal agency; the Board shall make and certify to the appropriate Federal agency an order requiring that agency to withhold from its loans or grants to the State or local agency to which notice was given an amount equal to 2 years' pay at the rate the officer or employee was receiving at the time of the violation. When the State or local agency to which appointment within 18 months after removal has been made is one that receives loans or grants from a Federal agency, the Board order shall direct that the withholding be made from that State or local agency.").

8. Bennett also argues that "[e]ven if a private action was allowed, the limited remedy for a Hatch Act violation is removal of the employee (or a monetary fine)." Appellee's Brief at 34. To the extent that Bennett argues that Burke's remedies are limited under the Hatch Act, we note that we are not addressing a Hatch Act violation. Rather, we are addressing Indiana's election contest statutes.

9. We focus our attention on 5 U.S.C. § 1502 (the Little Hatch Act) because while Burke argues that Bennett violated the "Hatch Act," Burke focuses on the Little Hatch Act and does not cite 5 U.S.C. §§ 7321–7326 (the Hatch Act).

concedes that "[t]he Little Hatch Act applies to the Hamilton Center because it is 'an agency which assumes responsibility for planning, developing, and coordinating Head Start programs.'" Appellee's Brief at 15 (citing 42 U.S.C. § 9851).[10]

Even though Bennett concedes that the Little Hatch Act applies to the Hamilton Center, he appears to argue that the fact that he worked at a nonprofit organization should be determinative. In *Brandon v. Southwest Mississippi Sr. Services, Inc.*, 834 F.2d 536 (5th Cir.1987), the Fifth Circuit addressed a similar situation. In *Brandon*, Marjorie Brandon worked at the Southwest Mississippi Senior Services, Inc. ("SMSS"), a nonprofit corporation. *Id.* at 536. Brandon was a Justice Court Judge and sought another term in the 1983 general election. *Id.* at 536–537. Officials at SMSS learned that Brandon was a Justice Court Judge and was seeking another term in the general election. *Id.* at 537. Brandon's employment with SMSS was immediately terminated as violative of the Hatch Act. *Id.* Brandon sued SMSS and alleged that the termination violated her First Amendment rights. *Id.* The district court disagreed and ruled against her. *Id.*

On appeal, Brandon argued that "her employment with SMSS is not covered by the Hatch Act because she is not considered a public or civil servant under Mississippi law." *Id.* The Fifth Circuit held that "Brandon's civil servant status under

Mississippi law is immaterial. It is enough that [Brandon]'s employment with Mississippi falls directly within the definition of state or local officer or employee contained in [5 U.S.C.] § 1501(4); we need not address her civil servant status under state law." *Id.*

We find *Brandon* instructive and adopt its reasoning. Here, Bennett is an employee of the Hamilton Center. As previously mentioned, 42 U.S.C. § 9851 governs political activities under Head Start programs and provides:

> For purposes of chapter 15 of Title 5, any agency which assumes responsibility for planning, developing, and coordinating Head Start programs and receives assistance under this subchapter shall be deemed to be a State or local agency. For purposes of clauses (1) and (2) of section 1502(a) of such title, any agency receiving assistance under this subchapter shall be deemed to be a State or local agency.

Bennett concedes that "[t]he Little Hatch Act applies to the Hamilton Center because it is 'an agency which assumes responsibility for planning, developing, and coordinating Head Start programs.'" Appellee's Brief at 15 (citing 42 U.S.C. § 9851). Because Bennett is an employee of an agency that is deemed a "State or local agency" under the Little Hatch Act, we do not find the fact that Bennett

---

10. 42 U.S.C. § 9851 governs political activities under Head Start programs and provides: For purposes of chapter 15 of Title 5, any agency which assumes responsibility for planning, developing, and coordinating Head Start programs and receives assistance under this subchapter shall be deemed to be a State or local agency. For purposes of clauses (1) and (2) of section 1502(a) of such title, any agency receiving assistance under this subchapter shall be deemed to be a State or local agency.

*See also* Scott J. Bloch, *The Judgment of History: Faction, Political Machines, and the Hatch Act*, 7 U. PA. J. LAB. & EMP. L. 225, 251 (2005) ("Employees of private nonprofit organizations can be covered by the [Little Hatch Act] if the federal statute through which the organization receives funds directs that the organization shall be considered to be a state or local agency for purposes of the [Little Hatch Act].").

worked at a nonprofit organization determinative. *See Brandon,* 834 F.2d at 537.

Next, we must determine whether Bennett, as an employee of the Hamilton Center, was an "officer or employee," 5 U.S.C. § 1502(a), which is defined by the Little Hatch Act as:

an individual employed by a State or local agency whose principal employment is in connection with an activity which is financed in whole or in part by loans or grants made by the United States or a Federal agency, but does not include—

(A) an individual who exercises no functions in connection with that activity; or

(B) an individual employed by an educational or research institution, establishment, agency, or system which is supported in whole or in part by a State or political subdivision thereof, or by a recognized religious, philanthropic, or cultural organization.

5 U.S.C. § 1501(4). Thus, to determine whether Bennett was an employee, we must determine whether: (1) his *principal employment*; (2) was *in connection with* an activity financed in whole or in part by loans or grants made by the United States.

### 1. *Principal Employment*

Bennett argues that his principal employment was not in connection with a federally funded activity. Specifically, Bennett appears to argue that "[e]very now and then Bennett would might [sic] have approved a work order for a stopped toilet or a faulty water heater in a Head Start facility, but he did the same thing for all of Hamilton Center." Appellee's Brief at 22. Bennett also characterizes the evidence suggesting a connection as "a handful of work orders and related paperwork." *Id.* at 20–21.

Bennett's arguments appear to advocate that we adopt the "scale theory" of determining principal employment, which the United States Civil Service Commission has defined as:

The "scale theory" is based on the idea that *employment* means the *sundry things which one does.* Its exponents consider "principal employment" equivalent to "principal part of employment"; for they have said in effect, that the principal part of the things which one does must be in connection with Federally financed activities, for him to be subject [sic] to the Act. In other words, the theory is that we must put on one side of the scales the things which an employee does in connection with Federally financed activities, and on the other side all the other occupational things which he does; and if the first does not tip the balance against the latter, it is urged that we must find the employee exempt from the Act.

*In re Hutchins,* 2 P.A.R. 160, 161 (1944) (asterisk omitted). The United States Civil Service Commission rejected the scale theory and noted:

Furthermore, if the 'scale theory' prevailed almost insoluable [sic] problems would sometimes confront us. Would those things be 'principal' on which a person spends more time; or those which are more important? Those which require harder work; or those which demand higher training? Those to which the employer contemplates the employee will accord first place; or those to which the employee actually gives primacy? Which function would be 'principal,' if one devotes 60 percent of his time and attention to work that he does individually, and 40 percent to supervising ten men engaged in other work? Would 'principal employment' be perhaps, the work which brings the

greater part of the employee's pay; or that in which he renders the more valuable service?

*Id.* at 163–164.

■■■ "Principal employment" as used in the statute refers to one's principal position or job. *See Special Counsel v. Gallagher,* 44 M.S.P.R. 57, 61 (M.S.P.B.1990) (holding that an employee is subject to the Little Hatch Act if "as a normal and foreseeable incident to his *principal position or job,* he performs duties in connection with an activity financed in whole or in part by federal funds") (emphasis added); *Hutchins,* 2 P.A.R. at 162 ("Should a stranger ask the author of the brief, 'What is your employment?' we think the answer would be, 'I'm an attorney'; not, 'I examine witnesses, make arguments, write briefs, draw wills, and organize bodies corporate.' "); *see also* Scott J. Bloch, *The Judgment of History: Faction, Political Machines, and the Hatch Act,* 7 U. PA. J. LAB. & EMP. L. 225, 251–252 (2005) (" 'Principal employment' relates to an employee's primary position—for example, whether for Hatch Act purposes he is considered a sheriff or an insurance salesman—and not to primary duties within public employment.") (citing *Matturi v. U.S. Civil Serv. Comm'n,* 130 F.Supp. 15, 16–17 (D.N.J. 1955); *Anderson v. U.S. Civil Serv. Comm'n,* 119 F.Supp. 567, 576–577 (D.Mont.1954); and *Special Counsel v. Carter,* 45 M.S.P.R. 447 (M.S.P.B.1990)). While Bennett worked part time as a high school and college sports official, he worked full time at the Hamilton Center, and the majority of his compensation came from this employment. Thus, Bennett's work at the Hamilton Center was his "principal employment."

### 2. In Connection With

■■■ Next, we must determine whether Bennett's work at the Hamilton Center was "in connection with" the Hamilton Center's Head Start program. *See* 5 U.S.C. § 1501(4) (defining "officer or employee" as "an individual employed by a State or local agency whose principal employment is *in connection with* an activity which is financed in whole or in part by loans or grants made by the United States or a Federal agency . . . .") (emphasis added). "The [Little Hatch] Act does not cover state employees whose connection with federally-funded activities is 'merely a casual or accidental occurrence' of employment, *In re Brown,* 3 P.A.R. 273, 300 (1974), because such a *de minimis* connection does not justify application of the Act." *Williams v. U.S. Merit Systems Protection Bd.,* 55 F.3d 917, 920 (4th Cir.1995) (footnote omitted). "It has long been established that an officer or employee of a state agency is subject to the [Little Hatch Act] if, as a normal and foreseeable incident to his principal position or job, he performs duties in connection with an activity financed in whole or in part by federal funds." *Gallagher,* 44 M.S.P.R. at 61.

We find *Williams v. U.S. Merit Systems Protection Bd.,* 55 F.3d 917 (4th Cir.1995), instructive. In that case, Lisa Williams worked as the Executive Assistant to the Director of the Governor's Office of Individuals with Disabilities ("OID"), an executive agency of the State of Maryland. *Williams,* 55 F.3d at 919. OID was a state funded agency that administered several state programs, including the federally funded Developmental Disabilities Council ("DDC"). *Id.* During Williams's employment at OID, the time sheets, bills, federal invoices, and other expenditures of the DDC program were channeled through the OID where they were consolidated and "signed off" by the OID Director before being forwarded for payment to the State Financial Administration Office. *Id.* Williams was authorized to sign the DDC

financial status reports in the Director's absence and did so on several occasions. *Id.*

In 1990, Williams ran as a partisan candidate for public office. *Id.* The OSC sent Williams three different letters informing her that she was subject to the Little Hatch Act. *Id.* Williams disagreed with the OSC and continued her ultimately unsuccessful run for office. *Id.* The MSPB charged her with violating the Little Hatch Act. *Id.* After a hearing, the ALJ found that Williams was a covered employee subject to the Little Hatch Act because she signed invoices authorizing payment of federal funds. *Id.* The MSPB adopted the ALJ's decision and ordered the OID to remove Williams from her employment. *Id.* On appeal from the administrative decision, the district court reversed and remanded, finding that Williams was not a covered employee because she did not exercise "discretionary or supervisory authority" over the use of federal funds. *Id.* at 919–920. The MSPB appealed the district court's decision. *Id.* at 920.

On appeal, the Fourth Circuit addressed whether Williams was subject to the Little Hatch Act. *Id.* Williams argued that she did not exercise administrative or executive discretion over the use of federal funds because she merely "rubber-stamped" approval of invoices and payment request forms on the rare occasions when the Director of OID was absent. *Id.* Williams also argued that "the district court was correct in determining that any discretionary authority she may have exercised was *de minimis* and did not warrant a finding that she was covered under the Act." *Id.*

The court held that the district court "went beyond the plain language of the Act, and the decisions interpreting that language, when it determined that the ac-

tual exercise of supervisory or discretionary control over federally-funded activity was the requisite connection necessary for Williams to be subject to the Act." *Id.* at 920–921. The court noted that the district court relied on *Special Counsel v. Carter,* 45 M.S.P.R. 447 (1990), in which the ALJ found that Carter had "supervisory and significant responsibilities in administering programs receiving federal funds" in discussing whether Carter's principal employment under the Act was as a state employee. *Id.* at 921 (quoting *Carter,* 45 M.S.P.R. at 452). The court held:

> [N]either *Carter* nor the other decisions relied upon by the district court expressly state that the exercise of discretionary authority in connection with federally-funded activity is required to hold a state employee subject to the Act. Hatch Act cases are fact specific, and the mere fact that several state employees found in violation of the Act also held or exercised such discretionary authority does not indicate that the exercise of discretionary authority is a necessary requirement to being covered under the Act.

*Id.*

The court focused on the "in connection with" language in 5 U.S.C. § 1501(4). *Id.* The court noted that OID administered federal funds through its oversight of DDC, even though DDC determined the actual use of the funds. *Id.* William's duties in connection with the federally funded activities of DDC were normal and foreseeable incidents to her job as Executive Assistant to the Director of OID because she had placed a signature card on file indicating that she was authorized to approve expenditures in the Director's absence. *Id.* Williams approved the use of DDC funds on several occasions, although most of her duties at OID were apart from federally funded activities. *Id.* Williams also signed her own name to approve pay-

ment of numerous DDC invoices, expense accounts, and grant payment requests. *Id.* The court concluded that "William's employment was 'in connection with' federally-funded activities" and that this connection "was sufficient to place Williams under the Act because it was a 'normal and foreseeable incident to [her] principal position or job,' *Gallagher*, 44 M.S.P.R. at 61, and was more than 'merely a casual or accidental occurrence' of her employment, *In re Brown*, 3 P.A.R. at 300." *Id.*

■ Here, Bennett was responsible for security, maintenance, and developing policies and procedures for purchasing and materials management for the Head Start program. Lascelles, the employee responsible for the Head Start program, would sometimes speak directly with Bennett about requests that she needed fulfilled for the Head Start program. Bennett approved specific projects, purchase requisitions, work orders, and contracts for the Head Start program. In 2007, Bennett signed contracts or purchase requisition forms for maintenance and improvements to the Head Start facilities. Specifically, Bennett signed a contract for concrete work in the amount of $10,875 at one of Hamilton Center's Head Start facilities. Bennett signed purchase requisition forms for annual maintenance of the HVAC systems at two of Hamilton Center's Head Start facilities in the amount of $126 each. Bennett also signed a mowing contract for all three of the Head Start facilities for approximately thirty cuttings at a rate of $25 per cutting at two of the facilities and $55 per cutting at the third facility. Bennett signed a purchase requisition form for a new hot water heater for one of the Head Start facilities in the amount of $593. Bennett signed a purchase requisition form for a roof for one of the Head Start facilities and Hamilton Center paid $1,600 down. Bennett signed a purchase requisi-

tion form for masonry restoration and repair in the amount of $3,240. Bennett also signed a snow removal contract for two of the Head Start facilities at $55 per occurrence. It was typical for Bennett to approve these contracts.

At oral argument, Bennett stated that courts found the connection to be de minimis in *Special Counsel v. Rafferty*, 2002 MSPB LEXIS 338, and *Brooks v. Nacrelli*, 331 F.Supp. 1350 (E.D.Pa.1971). We do not find these cases instructive. In *Rafferty*, the MSPB concluded that the OSC failed to establish that Rafferty "performed any work in connection with an activity that was financed in whole or in part by loans or grants made by the United States or a Federal Agency...." *Rafferty*, 2002 MSPB LEXIS at * 14. In *Brooks*, the court held that the case was appropriate for the application of the de minimis rule because the amount of federal aid was "nominal" and there was "no indication that defendants spent any time in connection with the federally funded activity (i.e. connection with the photographing equipment)." 331 F.Supp. at 1354. Here, unlike *Rafferty* and *Brooks*, there is a connection between Bennett's position and the Head Start program. The question is whether the connection is de minimis. The de minimis rule appears to have its origin in *In the Matter of Charles M. Slaymaker*, 2 P.A.R. 56, 61–62 (1943), in which the Civil Service Commission stated:

We can illustrate the effect of the "principal employment" amendment from another point of view. Opposing the bill as originally written, it was asserted by a member of the House that if W.P.A. laborers are working in a ditch, and a policeman removes a rock from the edge to prevent its falling in, he would be performing a "function" in connection with the W.P.A. work and would be subject to the Act. That startling assertion might have been true except

for the "principal employment" amendment. But the "function" of removing the rock was not a duty (or, as our rule says, a "normal and foreseeable incident") of his "principal employment,"—that of policeman.

Suppose a Springfield fireman were called upon to extinguish a blaze in the office of the Federally financed Research Bureau of the Division of Highways. Following the logic of the Congressman quoted in the preceding paragraph, the fireman might be subject to the Act except for the "principal employment" amendment. But his "connection with" the Federally financed activity, was *merely a casual or accidental occurrence,* and not a "normal and foreseeable incident" of his employment. His status would be very different from that of a Bureau watchman who might have put out the fire. (Emphasis added). Based upon the examples in *Slaymaker,* and Bennett's actions, we cannot say that Bennett's connection to the Head Start program is de minimis.

■ Based on the record, we conclude that Bennett's principal employment was "in connection with" the federally funded activity of the Head Start program. This connection was a normal and foreseeable incident to Bennett's principal position and more than merely a casual or accidental occurrence. Thus, we adopt the reasoning in *Williams* and conclude that Bennett's

11. Bennett argues that "Indiana should limit [Ind.Code § 3–8–1–5(c)(6) ]'s reach to those employees at private non-profits who plan, develop, coordinate, or otherwise implement the disqualifying Head Start programs." Appellee's Brief at 23. To the extent that Bennett argues that only employees who "plan, develop, coordinate, or otherwise implement the disqualifying Head Start programs" should be subject to the Little Hatch Act, the Fourth Circuit rejected this argument in *Williams* and focused on the "in connection with" language in 5 U.S.C. § 1501(4).

principal employment was in connection with an activity financed in whole or in part by loans or grants made by the United States.[11] *See Williams,* 55 F.3d at 921. We conclude that Bennett was an "officer or employee" because his principal employment was in connection with an activity financed in whole or in part by loans or grants made by the United States. Thus, Bennett was subject to the Little Hatch Act. *See id.*

Bennett violated the Little Hatch Act because he was subject to the Little Hatch Act and became a partisan candidate for office. *See Williams,* 55 F.3d at 920 ("Partisan candidacy by a covered employee, however, is a *per se* violation of the [Little Hatch Act].") (citing *Special Counsel v. Brondyk,* 42 M.S.P.R. 333, 337 (M.S.P.B.1989); 5 U.S.C. § 1502(a)(3) (1988)); *Crespo v. U.S. Merit Systems Protection Bd.,* 486 F.Supp.2d 680 (N.D.Ohio 2007) ("Partisan candidacy by a covered employee is a 'per se violation' of the Act.").

## C. *Whether Bennett Was Ineligible*

We now address Burke's claim that Bennett was ineligible under Indiana's election contest statutes. As previously mentioned, Ind.Code § 3–8–1–5(c) provides:

> (c) A person is disqualified from assuming or being a candidate for an elected office if:

To the extent that Bennett suggests that his salary did not come from federal funds, we note that "[i]t is not necessary to trace the Federal dollar into the paycheck of the Respondent. The standard as set out earlier is whether the principal employment of the Respondent is in connection with an activity which is financed in whole, or *in part*, by Federal loans or grants." *In re Brown,* 3 P.A.R. 273, 298 (1974).

* * * * *

(6) the person is subject to:

(A) 5 U.S.C. 1502 (the Little Hatch Act); or

(B) 5 U.S.C. 7321–7326 (the Hatch Act);

and would violate either federal statute by becoming or remaining the candidate of a political party for nomination or election to an elected office or a political party office.

Burke argues that, "[g]iven that Bennett was covered by the [Little Hatch Act] during his campaign and on the date of his election, he was ineligible to be a candidate for or to assume the office of Mayor." Appellant's Brief at 5. Burke argues that the focus must be on whether Bennett was ineligible at the time of the election, but Bennett argues that the question is whether Bennett was ineligible at the time that he assumed office.

We will first address when Bennett must be deemed ineligible. Burke disagrees with the following portion of the trial court's order:

Indiana case law has previously addressed whether a candidate who was disqualified from running could assume office provided the disqualifying basis had been remedied. *Hoy v. State*, 1907, [168] Ind. 506, 81 N.E. 509 (1907), concerned the 1905 election for city council in Lebanon. Two council members were to be elected from the four candidates. The third place finisher alleged that since the second place finisher was an officer of a company that had a contract with the city, making him ineligible to occupy any office pursuant to statute, the third place finisher should be deemed elected. The Court held that ineligibility must exist at the time the term of the office begins, *Hoy* [168 Ind.] at 513[, 81 N.E. 509] citing *Smith v. Moore* (1883), 90 Ind. 294. *Connell v.*

*State* ex rel. (1925) 196 Ind. 421, 148 N.E. 407 confirmed that such remained the law in Indiana, although not directly deciding the issue.

... where claimants were ineligible to the offices sought at the time of being elected thereto by reason of having voluntarily borne arms against the United States, or because they were capable of procuring the disability to be removed, and had become eligible when the time arrived for taking possession of their offices, qualifying and entering upon the performance of their official duties, the Court of Indiana and of many other states have held them eligible to fill such offices (*citations omitted*).

Appellant's Appendix at 20–21. Burke argues that the trial court's reliance on *Smith, Hoy,* and *Connell,* was misplaced because Ind.Code Chapter 3–12–8, which governs the contest procedures for election to local office, was enacted after *Smith, Hoy,* and *Connell.*

*Smith, Hoy,* and *Connell* addressed a candidate's eligibility to hold or assume office. *See Smith,* 90 Ind. at 296 (interpreting the phrase "No person elected to any judicial office shall, during the term for which he shall have been elected, *be eligible to any office* of trust or profit under th[e] State, other than a judicial office") (emphasis added); *Hoy,* 168 Ind. at 517, 81 N.E. at 512 (interpreting the phrase *"ineligible to any office* in said city") (emphasis added); *Connell,* 196 Ind. at 428, 144 N.E. at 884 (noting that the only qualification imposed by statute was that "[n]o person shall be *eligible to any city office* unless ....") (emphasis added). The Court in each case concluded that the phrase referred to the qualification to hold office, not to be elected, and that any ineligibility could be cured before the term of the office begins. *See Smith,* 90 Ind. at

296–298, 304; *Hoy,* 168 Ind. at 512, 517–518, 81 N.E. at 511–513; *Connell,* 196 Ind. at 428, 144 N.E. at 884. Thus, the Indiana Supreme Court recognized a distinction between the eligibility to hold office and the eligibility to become a candidate. *See Smith,* 90 Ind. at 304 (holding that "when such expressions as 'eligible to office' are used, they relate to the *holding* of office") (emphasis added); *Hoy,* 168 Ind. at 519, 81 N.E. at 513 (noting that the Kansas Supreme Court held that "[t]here is a marked distinction between a person who is ineligible or incapable of being elected and one who may hold the office") (quoting *Privett v. Bickford,* 26 Kan. 52 (1881)).

 Here, Ind.Code § 3–8–1–5 provides that "[a] person is disqualified from assuming office or *being a candidate* for an elected office if" certain conditions are met. (Emphasis added). Because Ind. Code § 3–8–1–5 addresses the eligibility of even "being a candidate," and is not limited to the eligibility of a person to hold office as in *Smith, Hoy,* and *Connell,* we focus not upon whether Bennett was ineligible at the time he took office, but rather upon Bennett's eligibility to be a candidate.[12] Because Ind.Code § 3–8–1–5 places the focus on Bennett's eligibility to be a candidate, we disagree with the trial court's reasoning that Bennett does not fall within the scope of Ind.Code § 3–8–1–5(c) because he is "mayor-elect" and "not a candidate." Appellant's Appendix at 20.

As previously mentioned, Ind.Code § 3–8–1–5 provides:

\* \* \* \* \*

(c) A person is disqualified from assuming or being a candidate for an elected office if:

\* \* \* \* \*

(6) the person is subject to:

(A) 5 U.S.C. 1502 (the Little Hatch Act); or

(B) 5 U.S.C. 7321–7326 (the Hatch Act);

and would violate either federal statute by becoming or remaining the candidate of a political party for nomination or election to an elected office or a political party office.

We have already concluded that Bennett was subject to the Little Hatch Act. *See supra* Part I.B. We have also concluded that Bennett "would violate" the Little Hatch Act by "becoming or remaining the candidate" because he was subject to the Little Hatch Act and became a partisan candidate for office. *See supra* Part I.B. Thus, Bennett was disqualified from being a candidate for an elected office under Ind.Code § 3–8–1–5.[13] Because Bennett was disqualified from even being a candidate, he was ineligible, and Burke had a right to contest the election on the ground that Bennett was ineligible. *See* Ind.Code § 3–12–8–2.

In summary, the trial court did not err when it found that Bennett was subject to the Little Hatch Act, but the trial court did err when it found that Bennett was

---

**12.** Ind.Code § 3–5–2–6 defines a candidate as a person who:

(1) has taken the action necessary to qualify under Indiana law for listing on the ballot at an election or to become a write-in candidate;

(2) has publicly announced or declared candidacy for an elected office; or

(3) otherwise seeks nomination for or election to an elected office, regardless of whether the individual wins election to the office.

**13.** "[D]isqualified" is generally defined as "[t]o render unqualified or unfit," "[t]o declare unqualified or ineligible," and "[t]o deprive of legal rights, powers, or privileges." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 522 (2006).

eligible because he would not have violated the Little Hatch Act at the time he took office. We conclude that Bennett was disqualified under Ind.Code § 3–8–1–5 from being a candidate and, therefore, was ineligible to assume office.[14]

## II.

The next issue is whether Burke must be declared elected pursuant to Ind.Code § 3–12–8–17 (Supp.2005), which provides that "[a]fter hearing and determining a petition alleging that a candidate is ineligible, the court shall declare as elected or nominated the qualified candidate who received the highest number of votes and render judgment accordingly." Burke argues that we should remand with instructions to declare him as elected to the office of mayor of Terre Haute because he is the qualified candidate who received the most votes.

While the language of the statute seems to support Burke's argument, the Indiana Supreme Court has interpreted this same language and reached a different result. In *Oviatt v. Behme*, 238 Ind. 69, 75–76, 147 N.E.2d 897, 901 (1958), Clyde Oviatt brought an action in January 1956 for a declaratory judgment for the purpose of determining his qualifications to run for the office of Treasurer of Vanderburgh County. The trial court decreed that Oviatt "was eligible and qualified for the office of Treasurer of Vanderburgh County and was entitled to be a candidate therefor

in the ensuing election." *Id.* at 76, 147 N.E.2d at 901.

At the general election in November 1956, Oviatt, John Behme, and Lee Jackson, ran as candidates for the office of Treasurer of Vanderburgh County. *Id.* at 71, 147 N.E.2d at 899. Oviatt won the election with 39,775 votes, while Behme received 33,453 votes and Jackson received 244 votes. *Id.* Behme brought an action to contest the election on the ground that he was the qualified candidate who received the highest number of votes. *Id.* Behme's contention was predicated upon the point that a constitutional amendment was adopted by the electors of the state in the general election of 1952, which extended the office of treasurer, among other officers, from two to four years and provided that the treasurer of each county reelected at the general election in 1952 shall continue in office until January 1, 1957 and shall not be eligible for re-election to the office of County Treasurer at the general election in 1956. *Id.* Oviatt was re-elected Treasurer at the January election in 1952 and by virtue thereof continued in office until January 1, 1957. *Id.*

On appeal, Behme argued that Oviatt was disqualified under the constitutional amendment and that Behme was entitled to the office by virtue of the following statute:

> The court shall determine the issues raised by such petition and answer thereto, and shall declare as elected or nominated, as the case may be, that

---

**14.** Bennett also places emphasis on the phrase "is ineligible" in Ind.Code § 3–12–8–17, which is titled "Hearing and determination of contest; judgment declaring candidate elected or nominated; order for special election," and provides, in part, that "[a]fter hearing and determining a petition alleging that a candidate *is ineligible,* the court shall declare as elected or nominated the qualified candidate who received the highest number of

votes and render judgment accordingly." (Emphasis added). Bennett argues that "Burke's proposed statutory interpretation requires this Court to rewrite the 'is' used by the General Assembly to be 'was.'" Appellee's Brief at 25. However, we have concluded that Bennett was ineligible to assume office because he was disqualified from being a candidate under Ind.Code § 3–8–1–5.

qualified candidate who received the highest number of votes, and render judgment accordingly, and the clerk of the circuit court shall certify such determination to the proper officer.

*Id.* at 74, 147 N.E.2d at 900 (quoting Acts 1945, ch. 208, § 346, p. 680, being § 29–5506, Burns' 1949 Replacement).

We note that this statute is substantially similar to the language of the current version of Ind.Code § 3–12–8–17, which provides, in part:

\* \* \* \* \*

(c) After hearing and determining a petition alleging that a candidate is ineligible, the court shall declare as elected or nominated the qualified candidate who received the highest number of votes and render judgment accordingly.

\* \* \* \* \*

In *Oviatt,* the Indiana Supreme Court held that the statute "must be interpreted in light of the common law, as well as the constitution of this state." 238 Ind. at 74, 147 N.E.2d at 900. The Court noted the following principle involved in the case:

The existence of the fact which disqualifies, and of the law which makes that fact operate to disqualify, must be brought home so closely and so clearly to the knowledge or notice of the elector, as that to give his vote therewith indicates an intent to waste it. The knowledge must be such, or the notice brought so home, as to imply a willfulness in acting, when action is in opposition to the natural impulse to save the vote and make it effectual. He must act so in defiance of both the law and the fact, and so in opposition to his own better knowledge, that he has no right to complain of the loss of his franchise, the exercise of which he has wantonly misapplied.

*Id.* (quoting *State ex rel. Clawson v. Bell,* 169 Ind. 61, 70, 82 N.E. 69, 73 (1907) (internal citation omitted)). The Court held that "[p]roperly qualified voters may not be disfranchised except by their own wilful or deliberate act to the extent that one who did not receive the highest vote cast may still be declared elected." *Id.* at 74–75, 147 N.E.2d at 900. The Court also held that "[t]he statute in question must be interpreted in accordance with the constitutional provision that 'all elections shall be free and equal'." *Id.* at 75, 147 N.E.2d at 900 (quoting Ind. Const. art. 2, § 1). "Otherwise it could happen that a candidate who received but very few votes would be entitled to an office although a vast majority of the votes were cast by voters believing in good faith another candidate was qualified when, in fact, he was not." *Id.* "The constitutional provision that 'all elections shall be free and equal' means that 'the vote of every elector is equal in its influence upon the result to the vote of every other elector'." *Id.,* 147 N.E.2d at 900–901 (internal citation omitted). The Court held that "the knowledge of the ineligibility of a candidate must be such on the part of those voting for him as to imply a wilfulness in acting and voting in defiance of the law and in opposition to such knowledge, *in order to nullify such votes without nullifying all votes 'equally' at the same time.*" *Id.,* 147 N.E.2d at 901 (emphasis supplied).

The Court noted that the declaratory judgment declaring Oviatt eligible was binding because it had not been appealed. *Id.* at 76, 147 N.E.2d at 901. The Court further noted that the declaratory judgment was given publicity in the newspapers of the county and held that "the voters of Vanderburgh County were justified in believing that appellant Oviatt was qualified as a candidate for re-election." *Id.* The Court concluded that Oviatt was

entitled to the office in controversy and reversed the trial court's judgment. *Id.* at 78, 147 N.E.2d at 902.

■ As previously mentioned, the statute at issue in *Oviatt* is substantially similar to Ind.Code § 3–12–8–17, which is at issue in this case. Judicial interpretation of a statute, accompanied by substantial legislative inaction for a considerable time, may be understood to signify the Legislature's acquiescence and agreement with the judicial interpretation. *See Fraley,* 829 N.E.2d at 492. Given the Legislature's inaction to modify the relevant statutory language since *Oviatt,* it appears that the Legislature is in acquiescence with the *Oviatt* interpretation.

■ Given *Oviatt,* we hold that it is incumbent upon the candidates to have issues of eligibility brought to the voters' attention prior to an election. We fault both candidates for not doing so in this case. Here, the trial court found that the voters did not know that Bennett's candidacy would violate the Little Hatch Act, and the parties do not challenge this finding. Based upon the holding in *Oviatt* that the voters must be aware of a candidate's ineligibility in order to nullify the votes *without nullifying all votes equally,* we must conclude that, even though Bennett was ineligible, Burke does not have a right to the office of mayor of Terre Haute under Ind.Code § 3–12–8–17.

To explain further, we find that the Supreme Court in *Oviatt* gave us only two options. To act constitutionally we must either count all votes cast in good faith, including those cast for a disqualified candidate, or count none of the votes cast in good faith, including those cast for the disqualified candidate and those cast for the qualified candidate, because there was no evidence that any of the voters were aware of Bennett's disqualification.

In this case, if we count all the votes cast, then we render all statutes enacted by the legislature disqualifying a candidate meaningless. In essence we would be indicating that these statutes never come into play when an election is challenged after the fact because we would be saying that the only question to be asked after an election is whether the voters believed the candidate was disqualified.

However, none of the applicable statutes so provide. The legislature has allowed challenges both before and after an election, and the legislature has not excluded the qualification statutes from post-election challenges. It is certainly not our job to rewrite the statutes.

Certainly if Bennett had filed for a declaratory judgment prior to the election and the trial court had ruled in his favor, then we would be in the same position in which the Supreme Court found itself in *Oviatt,* and, accordingly, would count all the votes. In that case a declaratory judgment had been rendered finding the candidate qualified. The declaratory judgment became the rule of the case and the Supreme Court enforced the rule of the case.

The Supreme Court noted that a declaratory judgment proceeding is a recognized method for the orderly determination of the issue and it also noted the publicity in connection with the declaratory judgment. The public relied upon that declaratory judgment when voting in favor of Oviatt. To decide that those votes and only those votes for Oviatt should not be counted would have certainly undermined the orderly judicial process, as well as the Constitution.

However, we do not have that situation here. Bennett, who had access to all the information necessary to determine his eligibility and who could have easily obtained such a determination before the election, chose not to do so. Therefore we do not

have a ruling that is binding on this court or upon which the voters relied, like in *Oviatt.*

Instead we have a candidate who is disqualified under the clear language of the statutes and whose qualifications were challenged after the election, as the legislature has clearly indicated can be done. However, to give full faith and credit to these statutes while acting constitutionally and in accordance with our Supreme Court precedent, we must count none of the votes because the voters were not aware of Bennett's disqualification when they voted.

■ We note that the parties do not raise the issue or develop arguments regarding the proper outcome when Bennett is ineligible and Burke is not entitled to the office under Ind.Code § 3–12–8–17. Nonetheless, in the interest of promoting both judicial and governmental efficiency, we will address the appropriate outcome. Because we have concluded that Bennett was ineligible and Burke does not have a right to the office of mayor under Ind. Code § 3–12–8–17, we conclude that a vacancy exists.[15] *See Hoy v. State ex rel. Buchanan,* 168 Ind. 506, 518–519, 81 N.E. 509, 513 (1907) ("It is, however, true that,

if Daily remained or continued to be an officer in the trust company in question on the day upon which his official term began, he would, under the facts in view of the statute, be ineligible or disqualified, and could not legally be inducted into or hold the office, and, as there was no predecessor filling it, a vacancy therein, under the circumstances, would have necessarily occurred, to be filled as provided by law.").

■ The dissent concludes that no vacancy exists and relies upon *State ex rel. Clawson v. Bell,* 169 Ind. 61, 82 N.E. 69 (1907); *State ex rel. Heston v. Ross,* 170 Ind. 704, 84 N.E. 150 (1908); *State ex rel. Davis v. Johnson,* 173 Ind. 14, 89 N.E. 393 (1909). To the extent that these cases suggest that no vacancy exists, we find them distinguishable because they involved quo warranto actions. *See Clawson,* 169 Ind. at 61, 82 N.E. at 70; *Ross,* 170 Ind. at 704, 84 N.E. at 150; *Davis,* 173 Ind. at 14, 89 N.E. at 393. "Quo warranto means 'by what authority' or 'by what warrant' and was the title of a common law writ used to determine the right of an individual to hold public office or to challenge a public officer's attempt to exercise a right or privilege derived from the state." *Lake Coun-*

---

**15.** We recognize that in *Patterson v. Dykes,* 804 N.E.2d 849 (Ind.Ct.App.2004), we affirmed the trial court's decision to order the incumbent councilman to hold over in his office an additional four years until the next general election for that office, pursuant to Article 15, section 3 of the Indiana Constitution. *Id.* at 854. However, the Indiana Supreme Court has held that Article 15, section 3 of the Indiana Constitution "requires that the time held over shall immediately follow the expiration of the term of office; that there shall be no holding or occupancy of the office by some one else between the expiration of the term and the time the incumbent holds over under the Constitution." *State ex rel. Hogue v. Slack,* 200 Ind. 241, 250, 162 N.E. 670, 673 (1928). *See also State ex rel. Carson v. Harrison,* 113 Ind. 434, 439, 16 N.E. 384, 386 (1888) ("Of course, it is not to be under-

stood that an office cannot become vacant, as respects the appointing power, *so long as it remains in the actual physical occupancy of some one who asserts a claim thereto.* An office is legally vacant unless the *occupant* has an unexpired right or title founded in the constitution or law, precisely as a house is vacant of a lawful tenant in case the lessee, without any provision authorizing him to hold over, refuses to surrender at the expiration of his term.") (Emphasis added). Unlike *Patterson,* here, Burke did not request the trial court to declare that, as the incumbent, Burke should continue to serve until a successor was elected and qualified. Further, Burke has not been the mayor or occupied the office as the holdover for a number of months. Based on Indiana Supreme Court precedent, we cannot say that Burke qualifies as the holdover at this point in time.

*ty Sheriff's Merit Bd. v. Buncich,* 869 N.E.2d 482, 484 (Ind.Ct.App.2007). A quo warranto action is not the same as a statutory election contest. *See State ex rel. McCormick v. Superior Court of Knox County,* 229 Ind. 118, 122, 95 N.E.2d 829, 831 (1951) (holding that "[a]s between the rival candidates, the title to the office may be adjudicated by the statutory contest, or by the concurrent remedy of quo warranto."); *State ex rel. Watson v. Pigg,* 221 Ind. 23, 28, 46 N.E.2d 232, 234 (1943) ("Since the adoption of the code in 1852 at least until 1933 quo warranto has been a concurrent remedy with contest for challenging the validity of an election. The information or quo warranto statute is an enlargement of the common law remedy. Contest is a special statutory proceeding not known at common law.") (internal citations omitted). Here, Burke filed an election contest under Ind.Code § 3–12–8–2 and Ind.Code § 3–12–8–6 and did not file a quo warranto action. This distinction is important for two reasons.

First, the standing requirements for a quo warranto action are different from those for a statutory election contest. In a quo warranto action, a prosecuting attorney or a person with an interest in the office may file the action. *See Bell,* 82 N.E. at 71;[16] *City of Gary v. Johnson,* 621 N.E.2d 650, 652 (Ind.Ct.App.1993) (addressing the standing requirements for a quo warranto action and holding that "[p]ursuant to Ind.Code 34–1–59–2,[17] an information may be filed by the prosecuting attorney or by any other person on his own relation whenever he claims an interest in the office, franchise or corporation, which is the subject of the information").

In a statutory election contest, Ind.Code § 3–12–8–1, which is titled "Candidates or voters entitled to contest," provides that "[a]ny candidate for nomination or election to a local or school board office may contest the nomination or election of a candidate who is declared nominated or elected to the office." We have already concluded that Burke does not have a right to the office of mayor of Terre Haute under Ind. Code § 3–12–8–17 based upon the holding in *Oviatt.* While the fact that Burke does not have a right to the office would affect his ability to bring a quo warranto action, we cannot say that it affects his ability to challenge the election under Ind.Code §§ 3–12–8–1.

■ Second, a quo warranto action requires that the person claiming an interest in an office must establish his right to the office. *See Heathco v. State ex rel. Addison,* 209 Ind. 667, 672, 199 N.E. 260, 262 (1936) ("It is elementary that, to prevail, in an action in quo warranto, seeking possession of an office, the relator must establish his right to the office, and that he cannot recover upon the weakness of the title of his adversary."); *Benham v. Bradt,* 170 Ind. 480, 84 N.E. 1084, 1087 (1908) (addressing a quo warranto action and hold-

**16.** The Court held:
Relator predicates his right to institute and maintain this action upon the provisions of sections 1145 and 1146 of the statute relating to the filing of informations, etc. Burns' Ann. St.1901. It is provided in section 1145, supra, that "an information may be filed against any person or corporation in the following cases: First, when any person shall usurp, intrude into, or unlawfully hold or exercise any public office. * * * " Section 1146 provides that "the in-formation may be filed by the prosecuting attorney in the circuit court of the proper county, upon his own relation, whenever he shall deem it his duty to do so, or shall be directed by the court or other competent authority, or by any other person on his own relation, whenever he claims an interest in the office. * * * "
*Bell,* 82 N.E. at 71.

**17.** Repealed by Pub.L. No. 1–1998, § 221.

ing, "It was incumbent on the relator, in order to maintain this action, to show in his complaint, and to prove upon the trial, that under the law he was eligible to be elected to the office in controversy, and he must recover, if at all, upon the strength of his own title to the office. He cannot prevail upon any infirmity or weakness in the title of appellee."). Unlike a quo warranto action, Ind.Code §§ 3–12–8 does not require that Burke establish his right to the office in order to challenge Bennett's right to the office.

Because Burke has standing to contest the election and Bennett is ineligible, we conclude that a vacancy exists. In light of this conclusion, we direct the parties' attention to Ind.Code § 3–10–8–1, which govern special elections. *See* Ind.Code § 3–10–8–1 ("A special election shall be held in the following case: .... (4) Whenever a vacancy occurs in any local office the filling of which is not otherwise provided by law."). We order the trial court to issue a writ of election pursuant to Ind. Code § 3–10–8–3.

For the foregoing reasons, we reverse the trial court's denial of Burke's petition contesting the election for mayor of Terre Haute, and remand for proceedings consistent with this opinion.

Reversed and remanded.

DARDEN, J. concurs.

NAJAM, J. dissents with separate opinion.

NAJAM, Judge, dissenting.

I respectfully dissent. The majority concludes that Bennett was subject to and violated the Little Hatch Act and, therefore, was ineligible to assume or be a candidate for the office of mayor of Terre Haute. *See* Ind.Code § 3–8–1–5(c)(6). Next, the majority concludes that, under our Supreme Court's opinion in *Oviatt v.*

*Behme,* 238 Ind. 69, 147 N.E.2d 897 (1958), Burke is not entitled to that office. But the majority then disregards *Oviatt* and holds that Burke is not required to establish a right to the office and is entitled to relief on his complaint in the form of a special election.

The *Oviatt* opinion is the culmination of a long line of Indiana cases on this issue, is still good law, and controls the outcome in this case. The majority opinion is incompatible with our well-established common law rule that a successful post-election challenge cannot be maintained on the grounds of the winning candidate's ineligibility unless the voters knew of that ineligibility and wasted their votes accordingly. The majority's analysis also ignores Indiana's statutory scheme on post-election challenges. Assuming, without deciding, that Bennett was ineligible, I would hold based on the undisputed evidence that Burke has failed to state a successful claim against Bennett and has no grounds to upset the election.

Burke's action against Bennett is governed by Indiana Code Chapter 3–12–8, which describes the post-election contest procedures for elections to local offices. Most relevant here are Sections 1, 2, and 17 of that Chapter. Indiana Code Section 3–12–8–1(b) and Section 3–12–8–2(1) give Burke standing to challenge Bennett's eligibility in a post-election setting. And Indiana Code Section 3–12–8–17(c) describes the remedy available to Burke upon a successful challenge: "After hearing and determining a petition alleging that a candidate is ineligible, the court shall declare as elected or nominated the qualified candidate who received the highest number of votes and render judgment accordingly." However, after acknowledging that "Burke does not have a right to the office of mayor of Terre Haute under Ind.Code § 3–12–8–17 based upon

the holding in *Oviatt*," Op. at 530, the majority nonetheless nullifies the election and concludes that Burke is entitled to other relief.

The majority correctly discusses, but then disregards, our Supreme Court's decision in *Oviatt*. There, the court held that the predecessor statute to current Indiana Code Section 3–12–8–17(c) "must be interpreted in light of the common law, as well as the constitution of this State." 147 N.E.2d at 900. The court then stated "the principle here involved" as follows:

> The existence of the fact which disqualifies, and of the law which makes that fact operate to disqualify, must be brought home so closely and so clearly to the knowledge or notice of the elector, as that to give his vote therewith indicates an intent to waste it. The knowledge must be such, or the notice brought so home, as to imply a wilfulness in acting, when action is in opposition to the natural impulse to save the vote and make it effectual. He must act so in defiance of both the law and the fact, and so in opposition to his own better knowledge, that he has no right to complain of the loss of his franchise, the exercise of which he has wantonly misapplied.

*Id.* (quoting *State ex rel. Clawson v. Bell*, 169 Ind. 61, 70, 82 N.E. 69, 73 (1907) (quoting *People ex rel. v. Clute*, 50 N.Y. 451 (1872))). I agree with the majority's conclusion that the General Assembly has acquiesced in the holding of *Oviatt*. *See* op. at 528. As explained below, under *Oviatt* Burke is not entitled to relief and there is no vacancy in the office of mayor of Terre Haute. Nevertheless, the majority declares a vacancy and grants relief to Burke by ordering a special election.

Again, Indiana Code Section 3–12–8–17(c) describes Burke's exclusive remedy in this action, namely, removing Bennett from office and placing Burke in that position. *See* I.C. § 3–12–8–17(c). But in *Oviatt*, our Supreme Court expressly held that an action can be maintained under that statute only if the losing candidate can demonstrate that the voters knew of the winning candidate's ineligibility at the time of the election. 147 N.E.2d at 900. Here, the trial court specially found that "neither Bennett, his employer, his opponent[,] or the electorate knew of the Hatch Act violation." Appellant's App. at 21. That fact is not disputed by the parties and, as such, this court on review may determine only whether the trial court correctly applied the law in light of that fact. *See, e.g., Lumbard v. Farmers State Bank*, 812 N.E.2d 196, 200 (Ind.Ct.App.2004). Accordingly, Burke's action under Indiana Code Section 3–12–8–17(c) cannot stand, and the trial court correctly entered judgment in favor of Bennett.

### The Common Law Before *Oviatt*

Since 1860, our Supreme Court, on numerous occasions, has recognized the common law principle identified in *Oviatt*. Most notably, in *State ex rel. Clawson v. Bell*, 169 Ind. 61, 65–71, 82 N.E. 69, 71–73 (1907), relied upon in *Oviatt*, the court thoroughly discussed Indiana law on that principle. The *Bell* court concluded:

> The number of votes which the relator in the case at bar received is far below those received by appellee. *To nullify the votes cast for the latter, in the absence of proof of the required knowledge of his ineligibility on the part of the persons who voted for him, and award to the relator the right to the office in question, would be antagonistic to the principles of popular government,* and would, as is shown by the number of votes cast for appellee, be in opposition to the deliberate choice of a large majority of the voters of Henry county. . . . *We find no warrant under the facts in*

*this case for holding that the votes cast for appellee should be treated as nullities, and therefore rejected, and the right to the office be awarded to the relator. In a legal sense, he has no more interest therein or thereto than he would have had he not been a candidate at said election. If appellee, as claimed, is disqualified for holding the office, the proper prosecuting attorney, as provided by the statute, can institute an action in the name of the State on his own relation to oust him from the office.*

(Emphases added.) In other words, the loser of an election has no legal right to maintain an action to remove an ineligible election winner "in the absence of proof of the required knowledge of [the winner's]

ineligibility on the part of the persons who voted for him." *Id.* at 73, 82 N.E. 69.

*Bell* is notable for another reason, namely, the action our Supreme Court did not take. After conceding, without deciding, the election winner's ineligibility, our Supreme Court did not order a special election.[18] Nor did it order the election winner's removal from office. Rather, because the election loser was unable to demonstrate the voters' knowledge of the election winner's ineligibility, the court dismissed his action and expressly refused to treat "the votes cast for [the ineligible election winner] ... as nullities." *Id.*

To be sure, there is language in *Bell* and other cases to suggest that the election of an ineligible candidate results in a "void" election or that that election "is a failure."

18. In *Bell*, our Supreme Court's determination not to order the removal of the ineligible election winner and not to order a special election were considered by implication, if not expressly stated. Two of the decisions from foreign jurisdictions the *Bell* court discussed ordered, on similar facts, special elections. *See People ex rel. Furman v. Clute*, 50 N.Y. 451, 465 (1872) ("unless the votes for an ineligible person are expressly declared to be void, the effect of such person receiving a majority of the votes cast is, according to the weight of American authority ..., that a new election must be had...."); *In re Corliss*, 11 R.I. 638, 644 (1876) ("The only effect of the disqualification ... is to render void the election of the candidate who is disqualified, ... [which requires] the choice of electors to fill such vacancy, by an election in grand committee."). But our Supreme Court did not follow the New York and Rhode Island cases and order a special election in *Bell*.

Another case cited in *Bell* did not order a special election. *See Commonwealth ex rel. McLaughlin v. Cluley*, 56 Pa. 270 (1867). Rather, in *Cluley*, the Supreme Court of Pennsylvania held, as our Supreme Court held in *Bell*, the following:

The votes cast at an election for a person who is disqualified from holding an office are not nullities. They cannot be rejected by the inspectors, or thrown out of the

count by the return judges. The disqualified person is a person still, and every vote thrown for him is formal. [I]t is said that *if sufficient notice is given of a candidate's disqualification, and notice that votes given for him will be thrown away, votes subsequently cast for him are lost,* and another candidate may be returned as elected if he has a majority of good votes after those so lost are deducted....

But the present relator suggests no such case. He does not even aver that, if the votes given for Cluley were thrown out, he received a majority, though doubtless such was the truth. He has therefore exhibited no such interest as entitled him to be heard.

\* \* \*

After what has been said, it will be seen that we are of opinion J.Y. McLaughlin has no such interest as entitles him to be heard in a writ of quo warranto. The question which he seeks to raise is a public one exclusively, and it can be raised only at the instance of the attorney-general.

56 Pa. at 273–75 (emphases added). Again, after reviewing those jurisdictions, our Supreme Court in *Bell* did not nullify the existing vote and order a special election. Rather, it held that the election loser did not have a cause of action because he had not shown that the voters knowingly threw their votes away on an ineligible candidate. *Bell*, 82 N.E. at 71–73.

*See id.* at 72, 82 N.E. 69. But that language was for the benefit of the State, which, at that time, had the authority to remove from office the ineligible winner of an election.[19] *See id.* at 73, 82 N.E. 69 ("If appellee, as claimed, is disqualified for holding the office, the proper prosecuting attorney ... can institute an action in the name of the State ... to oust him from office."). That language did not confer a legal interest upon the loser of an election to the office in question. *Id.* ("In a legal sense, he has no more interest therein or thereto than he would have had he not been a candidate at said election.").

Neither does our Supreme Court's analysis in *Bell* stand in isolation. *See, e.g., Fields v. Nicholson,* 197 Ind. 161, 165–68, 150 N.E. 53, 55–56 (1926) ("in the absence of proof that the voters wilfully threw away their ballots on a candidate they knew could not lawfully be elected, the mere fact that the one who received the largest vote was ineligible to be elected to the office or to hold it, is not enough to give the candidate who received a less number the right to the office."); *State ex rel. Davis v. Johnston,* 173 Ind. 14, 15, 89 N.E. 393, 393 (1909) ("the relator, having received neither a majority nor a plurality of the votes cast for candidates for county assessor, has no such interest in the office as entitles him to maintain this action. There was no averment in the complaint, and no evidence upon the trial, that the electors of the county, at the time they cast their votes for appellee, had either actual or constructive knowledge of his alleged ineligibility."); *State ex rel. Heston v. Ross,* 170 Ind. 704, 706–07, 84 N.E. 150, 150–51 (1908) ("In the absence of such a showing the complaint herein is fatally defective and the relator thereunder does not establish any right to maintain this action to oust appellee from the office and be awarded possession thereof for himself.").

In ordering a special election here, the majority finds a vacancy where there is none. In *Bell,* our Supreme Court assumed the election winner ineligible, yet did not remove him from office. 82 N.E. at 71–73. Neither did the court remove the ineligible, winning candidates in *Ross* or *Johnston. Ross,* 84 N.E. at 150–51; *Johnston,* 89 N.E. at 393. And in *Fields,* the court expressly held that the election winner was ineligible for office, but it refused to install the losing candidate to that office because the voters were unaware of that ineligibility. 150 N.E. at 55–56. Finally, despite Oviatt's ineligibility for office under the constitutional amendment at issue in that case, our Supreme Court did not remove Oviatt or order a special election. *Oviatt,* 147 N.E.2d at 899–902. Instead, the court expressly held that, because Oviatt's ineligibility was not clear to the voters that had re-elected him, Oviatt was "entitled to the office in controversy." *Id.* at 902.

It is true, as the majority notes, that *Bell, Ross,* and *Johnston* were quo warranto proceedings. But, for our purposes, that fact does not distinguish those cases. Rather, it emphasizes the significance of *Oviatt,* in which our Supreme Court, in interpreting the predecessor statute to Indiana Code Section 3–12–8–17(c), adopted from *Bell* the "principle" that voters cannot have their votes nullified by a court because of a candidate's unknown ineligibility. *See* 147 N.E.2d at 900. In other words, *Oviatt* applied the quo warranto standard to statutory post-election challenges. The majority's assessment, that "[u]nlike a quo warranto action, Ind.

---

**19.** Standing to challenge the eligibility of an election's winner has since been conferred, by statute, to the loser of that election. *See* I.C. §§ 3–12–8–1(b), –2(1). However, the election loser's remedy is still constrained by Indiana Code Section 3–12–8–17(c) and *Oviatt.*

Code §§ 3–12–8 does not require that Burke establish his right to the office," op. at 531, simply ignores the *Oviatt* holding. *Oviatt* is a bridge between the common law of quo warranto proceedings and our post-election contest statutes.

### *Oviatt* is Controlling Precedent

This panel is unanimous in its conclusion that the General Assembly has acquiesced in the *Oviatt* holding, which requires voter knowledge to nullify an election. The operative, material facts in this case are the same as those in *Oviatt,* and the post-election contest statutes in question are essentially the same. In other words, *Oviatt* is controlling precedent. Thus, it does not render the post-election contest statutes "meaningless" to count all the votes in the Terre Haute mayor's race. *See* op. at 528. Rather, we must follow the opinion of our Supreme Court, in which the Legislature has acquiesced for some fifty years. While *Oviatt* may have made some post-election challenges more difficult, we are an intermediate appellate court, and it is inappropriate for us to disregard that opinion. *See Horn v. Hendrickson,* 824 N.E.2d 690, 694–95 (Ind.Ct. App.2005).

The majority relies on dicta in *Oviatt* to distinguish that case from this one. While the *Oviatt* court discussed a declaratory judgment action upon which the voters had relied, *Oviatt* was not decided on law of the case grounds. The prior declaratory judgment action was a separate action. *See Perry v. Gulf Stream Coach, Inc.,* 871 N.E.2d 1038, 1048–49 (Ind.Ct.App.2007) (noting that application of the law of the case doctrine requires the same case). Nor was *Oviatt* decided on the grounds of res judicata, since Behme, the post-election challenger to Oviatt's seat, was not a party to the declaratory judgment action. *See Oviatt,* 147 N.E.2d at 901; *Perry,* 871 N.E.2d at 1048 (recognizing that applica-tion of the doctrine of res judicata requires identity of parties). Rather, the only conclusion that can be drawn from the court's reference to the declaratory judgment is that the court sought to emphasize the fact that members of the public did not know that Oviatt was ineligible for office and, therefore, did not knowingly throw their votes away by voting for him.

The majority also attempts to distinguish *Oviatt* on two other grounds. First, the majority asserts that if all votes are nullified "equally at the same time," *id.* at 69, 147 N.E.2d 897, and a special election is ordered, then there is no conflict with Article II, Section 1 of the Indiana Constitution. I need not address the majority's constitutional analysis but must note, again, that the majority disregards Indiana's well-established common law principle, which *Oviatt* incorporated into Indiana Code Section 3–12–8–17(c), that the voters must have knowingly wasted their vote on an ineligible candidate in order for the losing candidate to maintain an action under our post-election challenge statutes. *See Oviatt,* 147 N.E.2d at 900.

The majority also concludes that, although Burke "does not have a right to the office of mayor under Ind.Code § 3–12–8–17, ... a vacancy exists." Op. at 529. The majority then orders a special election under Indiana Code Section 3–10–8–1(4). That section provides for a special election "[w]henever a vacancy occurs in any local office[,] the filling of which is not otherwise provided by law." I.C. § 3–10–8–1(4). Hence, the majority concludes that while Burke cannot replace Bennett, Bennett can be removed from office. But neither Burke nor Bennett alleges that a vacancy exists in the office of mayor of Terre Haute. And, again, under *Oviatt* there is no vacancy. Thus, Indiana Code Section 3–10–8–1(4) does not apply, and the major-

ity errs when it nullifies the votes of the Terre Haute electorate.

### Special Election Statutes Do Not Apply

I must also note that the majority's resort to a special election cannot be reconciled with our statutory scheme for post-election challenges. The General Assembly has divided Indiana Code Section 3–12–8–17 into multiple subsections. Subsection (c) describes the remedy available upon a successful post-election challenge to a winning candidate's eligibility, and it is the grounds for Burke's complaint. But another subsection, (d), describes when a court, in a post-election challenge, may order a special election to ascertain the results of a prior election.

Subsection (d) states as follows:

(d) If the court finds that:

(1) a mistake in the printing or distribution of the ballots used in the election;

(2) a mistake in the programming of an electronic voting system;

(3) a malfunction of an electronic voting system; or

(4) the occurrence of a deliberate act or series of actions;

makes it impossible to determine which candidate received the highest number of votes, the court shall order that a special election be conducted under IC 3–10–8.

None of the factors described under subsection (d) are present here, and, as such, this court may not order a special election under our post-election contest statutes.

The majority's resort to a special election under Section 3–12–8–17(c), which contains no such remedy, violates the plain meaning of the statute. Neither subsection (c) nor subsection (d) provides for a special election under the circumstances of this case. Rather, to reach the remedy of a special election, the majority leaps from Indiana Code Chapter 3–12–8, which governs post-election contests and is the statutory basis for Burke's complaint, to Indiana Code Chapter 3–10–8, which governs special elections. In sum, the majority finds a post-election, special election remedy where none applies.

### Conclusion

The majority's conclusion that *Oviatt* denies Burke his action but that this court may nevertheless declare a vacancy and nullify the election is incongruous. Burke has not demonstrated that the voters for the office of mayor of Terre Haute knowingly wasted their votes on Bennett, and Burke therefore cannot maintain his cause of action under Indiana Code Section 3–12–8–17(c). *See Oviatt,* 147 N.E.2d at 900. The analytical flaw in the majority opinion is that it relies on Bennett's ineligibility rather than on the determination that, as a matter of law, Burke cannot prevail in his post-election contest. In our jurisprudence, Burke's inability to maintain a successful cause of action is the end of the matter. And it pre-empts the question of Bennett's ineligibility.

Indiana's election laws are for the benefit of the voters and the protection of the franchise. The voters are entitled to transparency, and Bennett should have obtained an Advisory Opinion from the U.S. Office of Special Counsel regarding his status under the Little Hatch Act. But both candidates here are at fault for not addressing Bennett's eligibility before the election. Contrary to the majority's suggestion, the idea that Burke was unable to discover Bennett's alleged Little Hatch Act violation until after the election results had been tallied is implausible.

The majority is correct in holding that, given *Oviatt,* it is incumbent upon candidates to have issues of eligibility brought to the voters' attention prior to an election.

*See* op. at 528. But that is precisely why I am obliged to dissent from the majority opinion. In its operation and effect, the rule in *Oviatt* is akin to a rule of estoppel. *Oviatt* means that candidates have a duty to discover and disclose eligibility issues before an election so that the voters can take those issues into account when casting their ballots. And, under *Oviatt*, a candidate with knowledge of a bona fide eligibility issue who fails to disclose that issue before the election is, in effect, estopped from raising that issue in a post-election challenge. The majority opinion nullifies the operation and effect of *Oviatt*.

For almost 150 years, our Supreme Court has consistently held that a successful post-election challenge cannot be maintained on the grounds of the winning candidate's ineligibility unless the voters knew of that ineligibility and wasted their votes accordingly. To permit otherwise encourages "gotcha" politics in which the loser of an election gets a second bite from the apple, claiming for the first time, after the fact, that the winner was ineligible. Like the majority, I disagree with the trial court's reasoning and conclusion that Bennett is not subject to Indiana Code Section 3–8–1–5(c) because he was "mayor-elect" and "not a candidate." But while I disagree with the trial court's reasoning, I vote to affirm the trial court's judgment that Bennett is entitled to remain in office. *See Mitchell v. Mitchell,* 695 N.E.2d 920, 923–24 (Ind.1998) ("we hold that where a trial court has made special findings pursuant to a party's request under Trial Rule 52(A), the reviewing court may affirm the judgment on any legal theory supported by the findings.").

I respectfully dissent.